MIRABILE *v.* SIMON J. MURPHY CO.

1. NEGLIGENCE—ELEVATORS—BURDEN OF PROOF.
    A showing that as plaintiff was alighting from defendant's elevator at the third floor, without negligence on plaintiff's part, it dropped and injured her, made a *prima facie* case, since the circumstances justified an inference of defendant's negligence.

2. SAME.
    Although there was no direct proof that the operator of the elevator caused it to drop, there was evidence from which the fact might be inferred.

3. SAME—FELLOW-SERVANT—MASTER AND SERVANT.
    Plaintiff, who was going to work at the time of her injury, not having reached the place where she was accustomed to don her working clothes, and not being engaged in the duties of

her employment as a scrubwoman, was not a fellow-servant with the operator of the elevator.[1]

4. SAME—DAMAGES—EXCESSIVENESS.
    A judgment of $4,500 for severe, painful and permanent injuries to plaintiff was not, on the record presented, excessive.

Error to Wayne; Donovan, J.  Submitted January 17, 1912.  (Docket No. 116.)  Decided March 29, 1912.

Case by Anna Mirabile against the Simon J. Murphy Company for personal injuries.  Judgment for plaintiff. Defendant brings error.  Affirmed.

*Keena, Lightner & Oxtoby*, for appellant.

*Navin, Sheahan & Kennary*, for appellee.

BLAIR, J.  Plaintiff was injured on the morning of May 2, 1910, while alighting from one of the elevators in the Penobscot Building on Fort street west, in Detroit, and this action was brought against the defendant and appellant, which owns and operates the office building, to secure damages for her injuries.  There is practically no dispute in the testimony given by the several witnesses. They were, on behalf of plaintiff, herself, James E. Hamilton, a passenger who was in the elevator at the time, her physician, Dr. Lowrie, and on behalf of defendant, Albert Larson, who knew nothing of the accident, but, as one of the regular elevator men, understood the operation of the elevator.  Plaintiff had worked as a janitress in the Penobscot Building from time to time before January 1, 1910, and from the first of the year on she was employed there steadily by the defendant company, whose office was on the twelfth floor of the building.  The elevator operators and the nightwatchman, as well as the janitresses, were under the direction of Mr. Cole, who was

---

[1] Liability of master for injury to employé caused by defective elevator and negligence of fellow-servant, see note in 2 L. R. A. (N. S.) 647.

Liability for injury to elevator passenger generally, see note in 2 L. R. A. (N. S.) 744.

the janitor of the building, and was also an employé of the defendant company. Both plaintiff and the other employés were paid on the 1st and 15th of the month at a stated monthly wage. There is a janitress for each floor of the building, and plaintiff thus had charge of the third floor. She was subject to be called to do work on other floors, and she did this at times. She cleaned and dusted the offices on the floor in question. She went to the building for her work both morning and evening. In the morning she got there about half past 5, and would work until about 8:30. She returned about 5 o'clock in the evening, and worked again until about half past 8. She got a pass key in the morning at the elevator, and, when she came in the evening, she would get it at the office on the twelfth floor. She would enter the building at the front door on Fort street. She cleaned some of the offices in the morning and some in the evening. After 6 o'clock in the evening there was usually only one elevator running, and in the morning when she got down there would be only one running. She always used the elevator, and never walked to the third floor. . Among the employés of the defendant were the watchmen, one named McLachlan, and the other named Young, who (or one of whom) would be on duty at night. It was McLachlan who operated the elevator at the time of the accident. It was a part of his duty to operate the elevator from about 10:30 at night until 6:45 in the morning. Except during these hours the elevators were operated by the regular elevator men, among whom the witness Larson was one. The watchmen used the elevator at night both to take people up and down and also to visit the several floors at intervals during the night.

On the morning in question, and at her usual time— that is, 5:30—plaintiff, having come down town in the street car, entered the Penobscot Building, and went into the elevator, asking McLachlan to let her off at the third floor. The witness Hamilton also entered the car on the ground floor to go to the thirteenth floor, where he

was employed by the firm of Ammerman, McCall & Anderson. The elevator stopped at the third floor. McLachlan opened the door, and plaintiff started out. She had one foot in the hall and one in the elevator when the elevator dropped. The elevator platform had fully stopped when plaintiff started out of it. Plaintiff was caught above the hips, between the floor and the top of the elevator cage, and was thrown back on the top of the cage. The car went down just as it would if the operator had pulled the lever back, and between the first and second floors McLachlan pulled the lever and stopped the car within 10 or 20 feet of where the accident happened. The conductor brought the car to a standstill, and, after it had stayed there for some little time, he asked Hamilton what to do, and Hamilton told him to run to the basement. McLachlan pulled the lever, and went down to the basement, and when the elevator got to the basement, it came to a stop. McLachlan controlled the elevator. The witness Larson ran the elevator upon which plaintiff was injured during some four months before the accident, and it ran in good working order. He never had any intimation that it was not in good working order. He learned of the accident when he came down in the morning. He ran the elevator in the afternoon, and it ran the same as before the accident. The trial of the issue before Judge Donovan and a jury resulted in a verdict for plaintiff of $4,500. A motion for a new trial was denied by the circuit judge.

Plaintiff testified:

"We drop the keys in the box in the evening, and the watchman goes up and gets them, and hangs them any place he wants in the elevator, and, when he comes in the morning, he hands them to us. I did not have my keys yet that morning."

Mr. Hamilton testified:

"*Q.* Do you know that the elevator platform is there, as I understand it, generally when they come up or down,

and brought to a stop. They oscillate or vibrate a little before they settle at the point?

"*A.* Yes, sir. It was not any such motion as that that threw the lady. It was a drop from a standstill. The car went down just as it would if he pulled the lever back. Between the first and second floor, he pulled his lever and stopped the car between 10 and 20 feet down where the accident happened. The thing that stopped the car was the elevator conductor, by shoving the lever. He came to a standstill as he did above."

Appellant's brief presents for our consideration three propositions, viz.:

(1) There is no evidence of any negligence on the part of defendant which was relied on in plaintiff's declaration.

(2) McLachlan, who was operating the elevator, and plaintiff, were fellow-servants.

(3) The damages were excessive.

1. This question was raised by the fifth request to charge, as follows:

"(5) The only allegations of negligence contained in plaintiff's declaration are (1) in not providing safe and suitable machinery in connection with the elevator; (2) in not having the same properly installed; and (3) in not having a competent elevator conductor. There is no testimony in the case tending to support any one of the allegations of negligence contained in plaintiff's declaration, and therefore your verdict will be for the defendant."

That portion of the declaration averring the duty of defendant in the premises and its violation thereof is as follows:

"And thereupon it became and was the duty of the said defendant through its agents, servants, and representatives to use due and proper care to provide and maintain safe and suitable machinery and appliances for the operation of said elevator, to have the same properly installed, and capable of running without dangerous and sudden jerks and falls, to place the same in charge of a skillful, competent, and careful conductor, and to operate the same so that all who might use said elevator, and plaintiff particularly, could enter and alight therefrom in safety.

Yet the said defendant, disregarding its said duty in the premises, did not use due and proper care to provide safe and suitable machinery and appliances for the operation of said elevator, and did not properly install machinery suitable and necessary to enable said elevator to move in an upward and downward direction at a safe and moderate rate of speed, and without sudden jerks, and long dangerous drops, and did not place the same in charge of a skilled, competent, and careful conductor, as a result whereof, without any negligence or fault whatsoever upon plaintiff's part, said elevator when it had reached the third floor stopped at plaintiff's request to enable her to alight, and when the operator had opened the door thereof, to permit her to alight, and while she was in the act of stepping from the elevator to the floor of the hall on the third floor of said building, and before she had an opportunity to step from said car into said hall, said elevator was dropped with a sudden and violent jerk, and without any warning whatsoever to her."

The duty to operate the elevator so that the plaintiff could "alight therefrom in safety" is alleged, but the negligent failure to so operate it is not charged, unless such charge is implied in the averment that, before plaintiff had an opportunity to step from the elevator, "said elevator was dropped," etc., implying that somebody dropped it, and not that it dropped without human agency. Doubtless, if the attention of counsel for plaintiff had been called to the particular question, he would have asked leave to amend the declaration, which would have been granted. But counsel for plaintiff was proceeding upon the theory stated in the brief as follows:

"The plaintiff was not obliged to show what the fault or negligence was that caused the elevator to drop. When the plaintiff proved that the elevator dropped while she was alighting therefrom, her negligence in no way contributing thereto, she made out a *prima facie* case, establishing the negligence of the appellant. The burden was then thrown upon the appellant to show that it was not guilty of negligence, for which it could be charged."

The weight of authority seems to be in favor of this proposition. *Edwards* v. *Building Co.*, 27 R. I. 248

(61 Atl. 646, 2 L. R. A. [N. S.] 744, and cases cited in note at page 748, subd. 3; 114 Am. St. Rep. 37; 8 Am. & Eng. Ann. Cas. 974). But such is not the rule in this State. *Sewell* v. *Railway*, 158 Mich. 407 (123 N. W. 2); *Niedzinski* v. *Electric Co.*, 160 Mich. 517 (125 N. W. 409); *Felske* v. *Railway*, 166 Mich. 367 (130 N. W. 676). Where, however, the facts and circumstances surrounding an injury are such as to justify an inference of negligence, no further proof of negligence is required. Cases last cited and *Schoepper* v. *Chemical Co.*, 113 Mich. 582 (71 N. W. 1081).

We agree with counsel for defendant that:

"There is no direct evidence that McLachlan, who was operating the elevator, shoved the lever at the time plaintiff was injured, but the only reasonable inference upon this record as to how the accident happened is that McLachlan pulled the lever and caused the elevator to go down."

There was, therefore, evidence of defendant's negligence.

2. Was McLachlan a fellow-servant with plaintiff? Defendant's counsel contend that the plaintiff was a fellow-servant of McLachlan from the time she entered the building for the purpose of doing her work there as an employé of the defendant company.

Plaintiff's counsel contend:

"The proofs in this case show conclusively that plaintiff at the time of the accident was not engaged in the work for which she was hired, but, on the contrary, was on her way to work, and had not as yet reached the place where she changed her street clothes for her working clothes. The plaintiff was not a servant of the defendant until she reached the place where her work commenced. That is the same place where she changed her street clothes for her working clothes."

Of the Michigan cases cited by counsel for defendant, the nearest in principle are: *Walkowski* v. *Consolidated Mines*, 115 Mich. 629 (73 N. W. 895, 41 L. R. A. 33); *Noe* v. *Railway Co.*, 133 Mich. 152 (94 N. W. 743).

See, also, *Moyer* v. *Railroad Co.*, 159 Mich. 645 (124 N. W. 542) *Howcroft* v. *Railway*, 163 Mich. 608 (128 N. W. 779). In *Walkowski* v. *Consolidated Mines*, 115 Mich. 629 (73 N. W. 895, 41 L. R. A. 33), plaintiff was injured while being taken down to work in the defendant's mine, some 500 feet or more, in a cage operated as an elevator. He was injured because the brakeman (that is, the elevator operator) turned the screw which controlled the cage in the wrong direction. As in this case, plaintiff failed to prove the allegation in his declaration, namely, that the brakeman was incompetent. On page 634 we find the following reference to the relation between the brakeman and plaintiff:

"It is admitted that Ryan and plaintiff were fellow-servants, and that the defendant is not liable for the negligent act of a competent fellow-servant."

In *Noe* v. *Rapid Railway Co.*, 133 Mich. 152 (94 N. W. 743), it was claimed by defendant (and the briefs show that it was conceded by plaintiff) that an employé of the defendant railway company while returning from work on one of its cars was a fellow-servant of the motorman. At page 155 of the prevailing opinion (133 Mich. [94 N. W. 744]), it is said:

"It is contended that the plaintiff was a fellow-servant of the motorman. If this be conceded, the result is not necessarily non-liability. True, the plaintiff would in such case be held to have assumed the risk of negligence of coemployés but, according to plaintiff's theory, and upon the proofs, it cannot be said that the motorman's negligence was the cause of the injury. The fault, if any, was in not providing a safe system in running the cars, as the motorman was quite within his orders in running the train at full speed in disregard of this switch. The fault, then, if there was a fault, was the fault of the master, the company."

In neither of these cases was the point determined or considered by the court. In the *Moyer Case*, plaintiff, a section hand, engaged in clearing away a wreck, was ordered

by his section boss to get on an engine and go to Mesick for his dinner, and to bring the dinners of the other section hands back to them.   It was held—

"That travel to and from the wreck for the purpose of bringing food for those engaged in its removal is likewise necessarily an incident of such employment."

In this case, the plaintiff had begun his work and was in the performance of part of his duties under orders of his foreman when injured.  In the *Howcroft Case*, plaintiff, a motorman, was returning from dinner to resume work upon his car.

"His car, in charge of a motorman, whom he was to relieve, and of a conductor, was standing, or came to a stand—having come from the north—on the north side of Waterloo street.  Its course there was to the south arm of the Y, then on that arm, backing in on the Y on Waterloo street preparatory to running out again on the north arm of the Y to Mt. Elliott avenue, and north on that avenue.  The ride which plaintiff proposed to take was across Waterloo street and on the Y to a point, where he, assuming charge of the car, could run it out on the north arm of the Y.  He attempted to enter the front vestibule of the car.  The car was started, and, while he retained his hold upon the car, he was seriously injured."

It is said in the opinion:

"It is asserted, in the brief, that plaintiff occupied the position of a stranger attempting to enter a car.  We are of opinion that the testimony conclusively establishes the fact that he occupied no such position.  To infer that he proposed to become a passenger to ride across Waterloo street and upon the Y, or that any one connected with the service so supposed, would be unreasonable.  To infer that he attempted to enter the car for some purpose connected with his employment is reasonable."

The car was the very place where his work was to be done, and a stranger or passenger would be required to pay for his ride.

In the case at bar the plaintiff's work was to be performed in the rooms on the third floor, and the elevator

was a public conveyance in which any one might ride without charge. The plaintiff was not actually performing any service for defendant. She would not begin her work until she had reached the third floor, and changed her clothes. Until that time she ought not to be held subject to the fellow-servant rule. The rule as it has developed since it was called into being by the courts has become in many instances a harsh and oppressive one and out of harmony with the enormous expansion of business operations and the spirit of the times, as evidenced by its abolition in certain hazardous employments by the legislatures of this and other States. We feel inclined, therefore, to limit rather than to extend the rule, where our own decisions do not precisely cover the point in issue. We do not regard this as such a case.

The judgment in our opinion was not excessive, and is affirmed.

MOORE, C. J., and STEERE, McALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BIRD, J. did not sit.