GERLACH *v.* DETROIT UNITED RAILWAY.

1. CARRIERS—NEGLIGENCE—STREET RAILWAYS—INSPECTION — DEFECTS IN CAR.

Evidence that the handhold of defendant's car gave way precipitating plaintiff, who weighed 200 pounds, to the pavement while in the act of alighting, that the wood remaining attached to the screws of the bracket was in decayed condition, and that the wood surrounding the screws was visibly darkened, presented a case for the jury upon the question of proper inspection.

2. SAME—EVIDENCE.

The defendant suffered no prejudice from a ruling of the court excluding evidence relative to the purpose of the handholds which was so obvious as to require no proof.

3. SAME—CARE REQUIRED.

Defendant was bound to observe a high degree of care in the maintenance of such appliance.

4. SAME.

The court did not err in refusing to charge the jury, as requested by defendant, that the pulling out of the bar, or happening of the accident, was no evidence of negligence.

5. SAME.

Defendant was chargeable with the duty of inspecting its cars, and the court correctly charged that, while it did not insure plaintiff, it was required to exercise reasonable diligence to discover defects, and in performing its duty to use ordinary tests such as pulling or application of force thereto.

Error to Wayne; Hosmer, J. Submitted June 5, 1912. (Docket No. 19.) Decided July 22, 1912.

Case by Edward H. Gerlach against the Detroit United Railway for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Corliss, Leete & Joslyn* (*Wm. G. Fitzpatrick*, of counsel), for appellant.

*Clarence P. Milligan*, for appellee.

Plaintiff, a man weighing upwards of 200 pounds, was injured while attempting to alight from one of defendant's cars. As the car was coming to a stop in response to his signal, plaintiff stepped toward the edge of the front vestibule, took hold of the handhold with one hand, and, when the car stopped or was just about stopping, he was thrown with considerable violence to the pavement by reason of the fact that the two metal brackets which held the wooden handhold in position tore away from the car. In falling, plaintiff carried with him in his hand the handhold and both brackets. Besides various cuts and bruises, plaintiff suffered a dislocation of the right shoulder; the evidence tending to show that his injuries were, to some extent, permanent in character.

It is not claimed by plaintiff that there was any negligence in the operation of the car. The duty and the breach thereof is stated in the declaration as follows:

"*First*, to operate Sherman line cars that were in fit and proper condition to act as conveyances for passengers; *second*, to transport plaintiff safely and securely to his destination; *third*, to use a very high degree of care and caution with reference to the condition of its cars and their appurtenances, upon which the public and especially plaintiff was invited to ride for money paid to defendant; *fourth*, to especially refrain from running on said Sherman line a car that was worn out, old, ancient, antiquated by reason of years of service on other lines, and in a condition unfit to be used for the transportation of passengers; *fifth*, to especially refrain from running over said Sherman line a car the woodwork of which was mellowed by age and usage, and so rotten that the bolts, screws, handles, brass, and iron works and brackets and handholds would collapse, pull out, and tear asunder when passengers, especially plaintiff, took hold of the same; *sixth*, to especially examine, inspect, adjust, repair, and replace all rotten, defective, and worn-out portions of said car, more especially the woodwork to which front handholds were attached on said Sherman line cars, the screws, brackets, handholds, and contiguous appurtenances, when said defendant knew or ought to have known that passengers, especially plaintiff, were invited to use these very

instrumentalities for their more safe and convenient exit from the cars. And plaintiff avers that said defendant, well knowing its duties in the premises, did carelessly and negligently omit to do or perform the same, in consequence of which plaintiff, while a passenger on said Sherman line car on or about the date as aforesaid met with severe and permanent injuries."

As to the condition of the car, plaintiff testified:

"*Q.* What did you notice, if anything, to be the condition of the wood, either that was attached to the screws or that was in the car?

"*A.* The wood pulled right out with the screws, and on the bottom of the screws, down below, the wood came right out the same as if you had pulled a screw out bending it down. The bottom wood was broke right off and rotten, and stuck right to the screws.

"*Q.* Could you see its condition by inspecting it?

"*A.* Plain enough. We looked at it. There was two others looked at it besides myself.

"*Q.* What was the wood; do you know?

"*A.* I never examined it.

"*Q.* What kind of screws were they?

"*A.* I never examined it to see whether it was oak or white wood.

"*Q.* What kind of screws were they?

"*A.* I think they were about an inch and a quarter round head, ten or maybe twelve. The screws at both ends came out. The condition of the wood, as I described it, existed at both ends. There was wood attached to all the screws. The general condition of the wood was rotten. There was no paint on the car. It was an old car. It was not a new painted car. The paint was pretty well worn. It was an old car."

On cross-examination he said:

" As I said, it was an old painted car, an old coat of paint. The wood underneath the brackets was rotten.

"*Q.* No; but what was the area?

"*A.* And to speak as to the brackets, it showed outside of the brackets where it was dirty and dark."

Upon the same question he offered the testimony of a fellow passenger.

"*Q*. And the brackets and screws—will you describe to the jury what you noticed about their condition?

"*A*. He took the handlebar from the man, and put it in the vestibule. I examined the handlebar, and noticed the screws had pulled right out of the socket, out of the wood, and there was still some of the rotten wood hanging to the screws, and then I looked at the wood where the handlebar was fastened to. I observed that they had both pulled out, top and bottom.

"*Q*. What was the condition of the wood on the car where they had pulled out?

"*A*. It looked rotten and worn out.

"*Q*. Was that noticeable from the outside?

"*A*. Yes, sir.

"*Q*. Well, was there any paint covering this rotten wood or was it worn off in places?

"*A*. It was painted in spots. It looked like all paint worn off."

On cross-examination this witness testified:

"*Q*. How about the wood on that post, did you know what kind of wood it was—that is, whether it was oak or elm or what it was?

"*A*. I am no judge of wood.

"*Q*. Underneath the lugs of the brackets or (of) the handhold you observed it looked kind of dark and rotten?

"*A*. Yes, sir."

To meet this testimony as to condition, defendant introduced its inspector's daily report from which it appeared that the car in question had been inspected and found "O. K." on August 30, 1910, the day before the accident, and that it was inspected in the ordinary manner by the motorman and conductor who took it out on the day of the accident. It also introduced evidence tending to show that, while the wood immediately under the lugs which held the handhold was soft and to some extent decayed, outside the lugs the wood showed no evidence of being unsound. It was likewise shown that the car was but four years old, was of a type and equipment in general use, and was purchased from a reputable manufacturer. The ordinary life of such a car, including the appliances

such as the handholds, was shown to be not less than 15 years.

The charge of the court was, in part, as follows:

"The degree of care which is required by the defendant and by all street car companies in inspecting the various appliances of its car must be a reasonable degree of care and caution. By this I mean, the degree of care to be used in the inspection of its car must conform to the nature of the appliance in the car it is intended and expected to use, and the actual use to which it is customarily put by the passengers in the car.

"In the case at bar, it is undisputed that the object of this handhold is to steady, aid, and to help passengers in getting off and on cars, and it must be expected that said appliance will be subjected to more or less strain, and that, as a consequence of this, it is the duty of the defendant not to make a perfunctory or careless inspection of it, but to make such an inspection of the handhold as is reasonable under the circumstances, and as will satisfy them that the handhold will answer the requirements naturally intended by it, and for which it is placed upon the car.

"Now, gentlemen of the jury, I charge you in this connection, as requested by the defendant, that the defendant company is not an insurer of the safety of its passengers. The only duty it owed to the plaintiff in this case, under the declaration and the evidence, was to provide a car with suitable appliances to enable the plaintiff to alight at his destination, and to see to it that those appliances were kept in a safe and proper condition of repair. The defendant is not required to provide its cars with all known and approved appliances necessary to protect its passengers from injury, but it is sufficient if it has all the approved appliances that are in general use, and which are necessary for the protection of its passengers and an appliance which has been in daily use for years and has uniformly proved adequate, and safe and convenient, may be continued in use without the imputation of negligence. I do not mean to say by that, gentlemen of the jury, that they are relieved from the duty of making such inspection as may reasonably be necessary at such intervals as may be proper. There is no evidence in this case that the handhold or its fastenings has been ever improperly, in-

sufficiently, or negligently repaired prior to the time of the accident.  I think that is so.

"It appears from the evidence that the car in question was procured by the defendant from a reputable and respectable builder and dealer not earlier than April, 1906; that it was a type of construction generally approved and a type of car in general use.  There is nothing to indicate that it was constructed of improper materials at the outset, nor that the wood posts to which the handhold was attached was originally defective, but it was such a car as the defendant had a right to use in its business.  There is no doubt about that.  But, of course, when I say that, I do not mean to say with reference to that, that they were relieved from the duty of inspection to which I have called your attention.  It appears from the evidence that the ordinary and average life of the car in question was not less than 15 years, and defendant had a right to continue the use of this car in its business up to the time of the accident in this case, provided they took such means as the law requires to apprise themselves of deterioration, decay or wear, by proper examination and inspection, and made such necessary repairs as were shown necessary.

"If you believe from the evidence that the defendant obtained the car in question from reputable and respectable manufacturers, not earlier than April, 1906; that it was constructed of proper materials, and that there was nothing to indicate that the wood in the posts to which the handhold was attached was originally defective; that the ordinary and average life of the car was not less than 15 years; that defendant employed such test, and made such tests and examinations as are required of it during its use of the car, and to apprise itself of the deterioration or decay, and that such test and inspection did not reveal the defects which were found to exist after the accident, or should or should not reveal such defects, then I charge you the defendant was not negligent in using this car in its business at the time of the accident and under those circumstances the plaintiff cannot recover.

"I am asked to charge you in this case the defendant was not obliged under the law and the evidence to furnish a handhold of sufficient strength and capacity to sustain the whole or substantially the whole of plaintiff's weight in his attempting to get off the car.  Well, doubtless, gentlemen of the jury, as an academic question that may be so, but at the same time I cannot exactly say how

much strain is ordinarily put upon a handhold of that description. At the same time, gentlemen of the jury, it is requisite that they should put on the car a handhold which would sustain the strain which would come from the ordinary use of that car, and I think in our daily life, gentlemen of the jury, we see people swing off from a car with one hand on the car and leaning a certain amount of their weight forward, and the only thing I can say to you on that subject is that you may, you must, find that it should be sufficient at least to take the ordinary strain which will occur in the running of cars; and, when I say ordinary strain, I do not mean the strain which comes from the use by the ordinary individual, for the street cars are not merely for you and for me, gentlemen of the jury, but they are for gentlemen as large as the plaintiff in this case, as large as Mr. Webber, on the other side of the table, and so I do not want you to think that I mean the strain an average man would give it, but the strain which would come in the ordinary use by those of the public who are entitled to use it. * * *

"I am asked to charge you in this case that the plaintiff was in duty bound to wait until the car had come to a stop before attempting to alight therefrom. So far as the right to use the handhold is concerned, and if, in attempting to alight before the car stopped, he subjected the handhold to an unusual or unreasonable strain, his weight considered, and under such strain it pulled out and resulted in his falling, I charge you plaintiff cannot recover. I cannot give that language, gentlemen of the jury. As I said before, as we go through life, we see people who will swing out from a car and I think the handhold—I think that is a part of the incidents of the ordinary use of a car. Of course, if a person gets off a car in motion, he takes the risk of so doing—that is, the risk which is consequent upon getting off a car in motion, but he does not necessarily, if he swings off from the car unless he puts some extraordinary strain upon the handle. He does not in the mere attempt to alight, gentlemen of the jury, take the risk of a defective handhold or a handhold that would not sustain the weight which is ordinarily incident to such an action. * * *

"With respect to the duty of inspection, all the law required of the defendant was that it should provide such necessary means as in the judgment of those who understand the subject and such as experience has shown would

be sufficient to secure the safety of its passengers, and to apprise itself of defects, deterioration, and want of repair, and, if such means are provided and proper use made thereof, it has discharged its duty in this behalf, and no negligence can be claimed on this head.  *  *  *

"I am asked to charge you that the defendant at and before the time of the accident provided a proper and sufficient means and system for the inspection of its cars. Of that there can be no question.  The system was unquestionably proper, but whether there was the proper inspection or not is a question, or one of the questions, in this case for you.

"Now, I am asked to charge you on the question of a latent defect.  Of course, gentlemen of the jury, if this may be said to be a latent defect which was not discoverable by the ordinary inspections, there would not be any liability.  It is claimed in this case, gentlemen of the jury, that there was no evidence of rotten wood from the outside that was open to a glance or a proper examination by the eye.  That is denied I think by the plaintiff in this case because the testimony of Mr. Newman contains some expressions which would tend to show that the wood was discolored around the lug, or whatever you may call it, that part of the front through which the screws were placed, and that it ought to have apprised the defendant of a possible deterioration.  What the fact is in this case is one of the questions for you.  All I can say is that if they made the proper inspection by applying a sufficient amount of force, if you think that that was essential to the inspection, and made a proper inspection with the eye, and that under those circumstances the mere fact that there was evidence of decay beneath might make it a latent, or would make it doubless a latent, defect for which they would not be liable, but whether there is a proper and sufficient application of force and putting of strain upon that handhold, if you find that to be part of a reasonable inspection, or whether an inspection would have disclosed the fact that the wood was so deteriorated that the handlebars should have been taken off, is a question for you, and not a question for me.

"I am asked to charge you, and do charge you, if you believe from the evidence that the defendant's agents and servants properly inspected the car and its appliances at all reasonable times before the accident, and that

171 MICH.—31.

such inspections did not disclose, and could not in reason have disclosed, the defect which was found to exist after the accident, then that the existence of such defects would not be negligence and plaintiff could not recover. I think that is so.    *    *    *

"I am asked to charge you that the law does not require defendant to make examinations and inspections of the handles to remove the screws and take off the brackets for the purpose of examining the condition of the wood underneath the bracket. I think that is so, gentlemen. I cannot lay down a rule telling you how much of an inspection there should be, or what inspection there should be, but there should be a reasonable inspection and if, gentlemen of the jury, you find from the evidence in this case there should have been a pressure or a strain put upon that bracket as a part of the inspection, if you find that a proper inspection of that kind would have disclosed the defect, why the plaintiff would be entitled to recover unless he has been guilty of negligence.

"And, too, gentlemen of the jury, if you believe that an inspection of the wood around the immediate vicinity of the lug by which the bracket was attached would have showed that the wood was deteriorating, you may find, gentlemen of the jury, that they ought to have made a further inquiry by the removal of the bracket, but if there was nothing, if a proper inspection disclosed nothing around the bracket to indicate a deterioration of the wood, they bought this car, I think, from a reputable manufacturer, and if the wood appeared sound, I think myself gentlemen of the jury, they were not obliged in the matter of inspection to remove the bracket."

Plaintiff having recovered a judgment of $1,800, defendant made a motion for a new trial, which was denied.

The case is now in this court for review upon the following questions, as stated by defendant:

"(1) There should have been a direction for defendant on the close of plaintiff's evidence.

"(2) There should have been a direction for defendant on all the evidence.

"(3) There was error in the court's refusal to receive the testimony of Savage as to the purpose the handhold was intended and designed to serve, and his refusal to charge as requested on this point, and his charge as given.

"(4) There was error in the court's refusal to charge as requested that the mere fact the handhold pulled loose and that the accident happened in this case is no evidence of negligence.

"(5) There was error in the overruling of defendant's motion for a new trial, and in the reasons of the judge given therefor."

BROOKE, J. (*after stating the facts*). 1, 2. Referring to the motion for a directed verdict, we need say no more at this point than that in our opinion the case presented on the part of the plaintiff was clearly one for the jury, under proper instructions.

3. Did the court err in refusing to receive testimony offered on behalf of defendant as to the purpose the handhold was intended to serve, and charging in respect thereto as he did? We think not. No testimony offered upon that question could have added to the knowledge already in the possession of each of the jurors. The use of the appliance is absolutely obvious. It is intended primarily as an aid to passengers in boarding and alighting from cars, but, when cars are crowded, it is frequently used by passengers to enable them to maintain themselves in a position upon the car which without its use would be impossible. It is intended for use by all who are invited to become passengers upon the cars of defendant. As, in its invitation to the public, no discrimination is or can be made by defendant in favor of those light in weight or against those who are heavy, it follows that defendant's equipment must be such as to reasonably meet the demands of all. The handhold is frequently subjected to severe strain. Appliances of this character, devoted to such uses, impose upon those who furnish them the duty of maintaining a very high factor of safety. The infrequency of such accidents as the one which caused the plaintiff's injury would indicate that both manufacturer and operator recognize this principle. Common experience teaches every one the character of the use to which the handhold is put. The defendant cannot be permitted to

say that it was not designed to be used in a manner which it daily permits and invites. It was not error to exclude the testimony offered, nor to charge the jury in accordance with the views here indicated.

4, 5. We are of opinion that to have given this request to charge without qualification would have amounted to error under our decisions. . The plaintiff's case was predicated, not only upon the fact that the handhold pulled out and the accident happened, but upon evidence that the wood underneath the lugs was decayed to such an extent that the screws drew out, and upon further evidence that the appearance of the wood immediately outside the lugs was such as might reasonably lead a careful and prudent inspector to suspect the existence of decay in the timber. Such evidence, coupled with the failure of the appliance, we think, warranted the court in submitting the question to the jury, who, in turn, might draw an inference of negligence on the part of defendant from the failure of the handhold and the happening of the accident under the circumstances disclosed by the testimony. Upon this point the following Michigan cases will be found instructive: *Barnowsky* v. *Helson*, 89 Mich. 523 (50 N. W. 989, 15 L. R. A. 33); *Stoody* v. *Railway Co.*, 124 Mich. 420 (83 N. W. 26); *La Fernier* v. *Wrecking Co.*, 129 Mich. 596 (89 N. W. 353); *Howell* v. *Railway Co.*, 136 Mich. 432 (99 N. W. 406); *Sewell* v. *Railway*, 158 Mich. 407 (123 N. W. 2); *Niedzinski* v. *Electric Co.*, 160 Mich. 517 (125 N. W. 409); *Mirabile* v. *Simon J. Murphy Co.*, 169 Mich. 522 (135 N. W. 299).

We are of opinion that the instructions of the court with reference to the duty of inspection were proper. It is obvious that the handhold is, so far as the safety of the passenger is concerned, one of the most vital parts of the car. We may say of defendant here, as was said of defendants in the case of *Scott* v. *Athletic Ass'n*, 152 Mich. 684 (116 N. W. 624, 17 L. R. A. [N. S.] 234, 125 Am. St. Rep. 423, 15 Am. & Eng. Ann. Cas. 515):

"They were not insurers of safety, they did not contract that there were no unknown defects, not discoverable by the use of reasonable means; but, having constructed the stand, they did contract that, except for such defects, it was safe."

In the case of *Texas, etc., R. Co.* v. *Allen*, 114 Fed. 177 (52 C. C. A. 133), which upon the facts much resembles the case at bar except that there an employé instead of a passenger was injured, the court of appeals for the fifth circuit approved of the following definition of the word "inspection:"

" 'Inspection,' gentlemen, as used in the court's charge, is an inquiry, by actual observation, into the state, efficiency, safety, and quality of the thing inspected. Inspection of the appliances and instrumentalities in use by a railway company should not rest alone upon the vision, because there are many defects, the existence of which could be ascertained by reasonable and ordinary tests which involve the exercise of senses other than the sense of vision. I should say the railway company would be liable for those defects in its appliances and instrumentalities which, in the course of inspection, could be perceived —that is, capable of coming under the cognizance of any one or more of the senses of man in the exercise of ordinary care. Inspection not only involves looking at cars and appliances, but as well all those tests which would ordinarily be used to ascertain the condition of cars and appliances that a reasonably prudent man would use in the exercise of such an undertaking."

The charge, as a whole, we think, presented the question of defendant's negligence fairly. No error is discovered in the record. The judgment is affirmed.

MOORE, C. J., and STEERE, MCALVAY, STONE, OSTRANDER, and BIRD, JJ., concurred. BLAIR, J., did not sit.