MAKI v. ISLE ROYALE COPPER CO.

1. MASTER AND SERVANT—EVIDENCE—PRESUMPTIONS.

Where plaintiff was struck by an empty bucket which fell on him while he was employed in the mine of the defendant, and the testimony tended to show that the bucket had been fastened to a lowering device by a knotted chain, although there was no proof that a bolt or key had not been used in fastening the chain, evidence that the use of such bolt or fastener would prevent the loosening of the knot, had a tendency to support the claim of the plaintiff, and under the established rule that the facts must be considered in the light most favorable to the party against whom it is proposed to direct a verdict, the question should have been left to a jury.

2. SAME—SAFE PLACE—MINES—SAFE APPLIANCES.

The master is required to furnish a reasonably safe place in which the servant may carry on his work, and to maintain the appliances used in carrying it on in reasonably good repair.

3. SAME—FELLOW-SERVANTS.

The duty to ascertain that the chain and hoisting apparatus was safe and properly adjusted was a nondelegable duty of the employer.

Error to Houghton; Cooper, J., presiding. Submitted April 30, 1914. (Docket No. 139.) Decided June 1, 1914.

Case by Jacob Maki against the Isle Royale Copper Company for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Reversed.

*Le Gendre & Driscoll*, for appellant.

*Rees, Robinson & Petermann*, for appellee.

KUHN, J. The plaintiff received injuries as the result of an accident while in the employ of the de-

fendant, and the question here involved is how the accident occurred and whether it can be said to be attributable to the negligence of the defendant. The learned trial judge, at the close of plaintiff's proofs, directed a verdict for the defendant, on the ground that the proofs were insufficient to show any negligence on the part of the defendant, and also that the negligent act which the plaintiff assumed there was sufficient evidence to support to require its submission to the jury was the act of plaintiff's fellow-servant.

The defendant was operating a copper mine and a stamp mill in Houghton county. Inside of the mill were stamp heads to break the rock, the foundations of which are made of concrete. One of these heads had become defective, and the defendant, in the spring of 1911, was engaged in reconstructing it. A hole about 35 feet deep had been mined, and fresh concrete was being put into the hole. The concrete was mixed on the floor of the mill near the top of the hole and was lowered into the hole by a half-ton coal bucket, about two feet square and high. For this purpose there was used a steam winch, consisting of a niggerhead attached to the shaft of an engine, so that the engine would turn it, a hemp rope, and two double blocks, the upper of which was attached to a carriage near the top of the mill, and the lower of which was suspended beneath the upper; the rope being passed through the blocks in such manner that between them were three thicknesses of rope. There was a hook on the lower block to which the bail of the bucket could be attached. The operations in the mill were in charge of Jim Glanville, who was the superintendent, and Jack Glanville, who was known as the mill boss and also as the master mechanic and, at the time of the accident, was the foreman of the gang on the job. On the day of the accident, he fixed

up the hoisting apparatus for lowering the concrete into the hole. At first the bail of the bucket was attached directly to the hook of the lower block, but at the time of the accident, instead of the bail being attached directly to the hook, it was attached to it by means of a 10-foot chain, which was done by Jack Glanville, who had general charge of all the machinery about the mill, and whose duty it was to inspect it and keep it in repair. The plaintiff had been hired on the day before the accident as a surface hand to level ground and perform similar common labor. On the day of the accident, he and three others of the surface gang were ordered by the surface boss to go to the mill for work and were there ordered by the mill boss to go down in the hole and empty concrete from the bucket when it was lowered and spread and tamp the concrete in the hole. When they first started to work, small rocks fell down upon them, and one of their number went up and told the superintendent that they did not want to work there. The superintendent told them to go back to work, and that he would see that nothing fell on them. Planks were then placed over the hole, leaving only a space large enough for the bucket to pass through. It was at this time that the chain was used by Glanville. It had a ring at one end and was wound twice around the bail of the bucket, then passed through the ring at the end of the chain, and then passed upward to the hook of the lower block, to which the other end was attached by a double knot in the chain. After the plaintiff had been working in the hole about two hours, without any warning, the chain became unloosed from the hook of the lower block, and the bucket, while empty, fell and struck the plaintiff and caused the injuries complained of.

There was testimony to show that, if a chain were knotted in the way this chain was, it should also be bolted in order to be reasonably safe. The learned

trial judge held that there was no evidence that there was no bolt in the knot in the chain in question. The testimony with reference thereto was as follows:

Witness Abramson testified:

"I saw the plaintiff get hurt. The bucket hurt him. The bucket fell and struck him. It fell from the top.

"*Q.* Before it fell, was it at the place where it would hang while it was being loaded?

"*A.* Just the same place. It didn't strike anything before it fell. When it fell there was a chain attached to the bail of it. That was the chain by which it had been attached to the hook on the block; I think the length of that chain was about ten feet.

"*Q.* And was there any hook or rings on the end of the chain?

"*A.* No, there was none.

"*Q.* Wasn't there something on one end of the chain?

"*A.* At the end it was attached to the bail of the bucket, I don't remember whether there was a ring or hook.

"*Q.* But there was nothing on the other end, neither ring or hook?

"*A.* The other end there was neither one.

"*Q.* And how had it been attached to the hook of the block?

"*A.* By a knot in the chain. When the bucket fell the chain came with it. * * * When the bucket fell down one end of the chain was attached to the bail of the bucket, and the whole chain came down with the bucket. There was no hook or ring in the loose end of the chain; that is, the end opposite to the one which was attached to the bail of the bucket. There was nothing there.

"*Q.* Where was the block, the lower block, at the time the bucket fell?

"*A.* It was up there at the place where the bucket was filled in, and where it fell from. I saw the lower block right after the bucket fell. There was no hook or ring then attached to the hook of the block; there wasn't any. No hook or ring fell. No loose hook or ring fell at the time the bucket fell into the hole.

"*Q.* Did you see, before the bucket fell, how the chain was attached to the hook of the block?

"*A.* It was attached by' a knot."

On recross-examination he said:

"*Q.* You don't remember how this chain was fastened to the bail of the bucket?

"*A.* I don't remember whether there was a hook or ring, but one of those was there. It must have been a ring there. It could not have been anything else. I said I didn't know whether it was a ring or a hook because I don't remember just which one it was. I am not sure that it was a ring now, but I think so.

"*Q.* How was it fastened with this ring? Just describe how the chain was fastened to the bail of the bucket.

"*A.* The chain would be up through the ring and around the bail. I mean the chain would be up around the bail first, then through the ring. That was still attached that way when the bucket reached the bottom of the hole. I looked at this chain to see how it was fastened to the bucket and to the rope after it fell down and right after Maki was taken up. I looked at the manner in which the chain was fastened to the block at the time it was up there. That was about 9 o'clock in the morning. That' was before I went down in the hole. I looked this thing over before I went into the hole.

"*Q.* Now what was there in the block, a hook or a ring, attached to the block?

"*A.* Hook.

"*Q.* Just describe how this chain, now, was fastened to the hook. Just tell in detail just exactly how it was fastened?

"*A.* I don't know; I didn't see just exactly how it was; all I do know it was tied by a knot. The knot was in the chain. Made out of the chain and that fastened to the hook. The chain was run around the hook twice. It was a double knot. There was nothing at the end of the chain excepting the last link. There was no hook or ring. I am absolutely sure of that. Right after the accident I went up to look at the block. I went up for the purpose of looking at the block. I examined the block very carefully.

\* \* \* The block itself was all right; it was good, except that the knot got open. Wendela and Arvo looked at the chain with me down below. They both examined the chain; I helped to bring Maki up. I did not examine the chain before we brought him up, after he was taken up. After he was taken up then I went down and examined this chain, then I came up and examined the block."

Again, on redirect examination, he testified:

"Q. What was it that caused the bucket to fall?

"A. The cause was because the knot got open and loose and it came down."

On being recalled, he said:

"Q. You have testified that the chain was attached to the hook of the lower block by knotting it.

"A. It was knotted.

"Q. Was there any bolt through the chain or anything there to prevent the knot from slipping?

"A. That I don't remember, if there was any.

"Q. Wouldn't you remember it if there was one there?

"A. I don't remember at all.

"Q. Didn't you look at the chain after the accident?

"A. Yes.

"Q. You didn't see any bolt on it then, did you?

"A. No.

"Q. No bolt dropped down in the hole after the bucket fell, did it?

"A. No.

"Q. And you saw no bolt around there any place? That is, no loose bolt?

"A. Nowhere. When the chain was knotted there, I could see the ends of the chain. The end of the chain was quite long, but I don't remember if there was anything else there, but the time we came down there was nothing there then."

Witness Quinlan testified:

"Q. In your opinion, where a bucket of the size I have described is being used above a place where men are working, is it safe or proper to use a chain with knots in it?

"*A.* I don't consider it is. I am a little against using a chain the likes of that kind without it's a mighty good chain. A steel tested chain and knots on a chain is very uncertain without a keeper of some kind, a bolt through the links to keep it from slipping. The shaking and jerking loosens the chain.

"*Q.* If a 10-foot chain were used to connect the bail of the bucket with the lower hook (or the hook of the lower block) and was knotted, say, with a double knot, and a bolt was put through it in the way you have suggested and put in there properly, could the bucket fall away when the bucket was empty, by becoming disconnected from the hook while hanging suspended, could the knot become loosened?

"*A.* Not very well, I should judge. The chain would have to break, I should judge.  *   *   *

"*Q.* And, if it is so fastened, would the bucket fall away merely of its own weight; that is, of its own weight while it is being suspended empty?

. "*A.* It couldn't very well fall away unless the puffer let the slack out of it the chain broke.

"*Q.* You have seen where the chain became unloosened from the hook after it had been fastened?

"*A.* I don't think it could. I never seen one come loose with the bolt through."

It is true that there is no positive direct testimony that there was no bolt in the knot at the time of the accident, but, having in mind the well-established rule that, in directing a verdict for the defendant, the facts in the case should be viewed most favorably to the plaintiff, can it be said that a reasonable inference cannot be drawn that the bucket fell because of the failure to furnish the knot with the necessary bolt? In this State, defendant's negligence cannot be presumed and must be proven, but we think the reasoning of this court in *Schoepper* v. *Chemical Co.*, 113 Mich. 582, 586, 589 (71 N. W. 1081, 1082, 1084), is applicable to the instant case. Justice MONTGOMERY, speaking for the court, said:

"Defendant's counsel contend that the cause of this explosion is a matter of mere conjecture, and it is

said by counsel that it is not enough for plaintiff to prove circumstances consistent with her theory, but that these circumstances, and each of them, must preclude any other rational conclusion. This we take to be but another way of stating the proposition that the proof must exclude all reasonable doubt. It is hardly necessary to say that no such rule obtains in civil cases. It is true that where an injury occurs that cannot be accounted for, and where the occasion of it rests wholly in conjecture, the case may fail for want of proof. *Robinson* v. *Charles Wright & Co.,* 94 Mich. 283 [53 N. W. 938] ; *Redmond* v. *Lumber Co.,* 96 Mich. 545 [55 N. W. 1004]. But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities and for drawing reasonable inferences better supported upon one side than the other. In this case there was no direct proof of any other probable producing cause of the explosion than such as was offered by the plaintiff. * * * Negligence, like any other fact, may be inferred from circumstances. *Alpern* v. *Churchill,* 53 Mich. 613 [19 N. W. 549] ; *Barnowsky* v. *Helson,* 89 Mich. 523 [50 N. W. 989, 15 L. R. A. 33]. And, though the proof of plaintiff depended upon inference to establish the main fact, the question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, was for the jury. *Crosby* v. *Railway Co.,* 58 Mich. 458 [25 N. W. 463] ; *Hagan* v. *Railroad Co.,* 86 Mich. 615 [49 N. W. 509] ; *Woods* v. *Railway Co.,* 108 Mich. 396 [66 N. W. 328]. The judgment will be reversed, and a new trial ordered."

See, also, *La Fernier* v. *Wrecking Co.,* 129 Mich. 596 (89 N. W. 353) ; *Mirabile* v. *Murphy Co.,* 169 Mich. 522 (135 N. W. 299) ; *Maki* v. *Mining Co.,* 176 Mich. 497 (142 N. W. 780).

We have, in the instant case, the testimony above set forth and the physical fact that the bucket fell while it was empty and suspended upon the chain without being subjected to any unusual strain or jar. We are of the opinion that a reasonable inference

supporting the plaintiff's theory of the case might properly be drawn by a jury, and that this question should have been submitted to the jury.

The rule that it is the duty of the master to provide his servant a place reasonably safe to work in, and that it is his duty to keep the machinery and appliances used in carrying on the work in reasonably good repair, is firmly established in this State.

Likewise that when the master delegates this duty to a servant, no matter what his grade or rank, the servant cannot be held to be a fellow-servant to relieve the master of liability. Jack Glanville's duty to see that the chain was safe and properly adjusted was the duty of the master, and in doing so he acted for the master. In this he was the defendant's agent and vice principal and not the plaintiff's fellow-servant. *McDonald* v. *Railroad Co.*, 132 Mich. 372 (93 N. W. 1041, 102 Am. St. Rep. 426) ; *Orso* v. *Engineering Works,* 164 Mich. 568, 571 (129 N. W. 673), and cases cited.

It follows that the judgment must be reversed, and a new trial granted.

McALVAY, C. J., and BROOKE, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.