### SCOOP *v.* W. H. WHITE CO.

1. TRIAL—DIRECTED VERDICT—EVIDENCE.

   In considering the contention that a verdict should have been directed for a defendant, the testimony for the opposite party must be taken as true and regarded in its most favorable light.

2. MASTER AND SERVANT—FELLOW-SERVANTS—SAFE PLACE.

   Employees of a lumbering corporation who were engaged in preparing the roads and keeping them in proper condition, sanding the track on the declivities and shoveling off snow when it was necessary, were not fellow-servants with teamsters who drove logs over the roads.

3. SAME—LOGS AND LOGGING.

   Employees whose duty it is to prepare and keep a safe place for other servants perform an unassignable duty of the master.[1]

4. SAME—SAFE PLACE.

   And where the lumbering company employed special servants to prepare the logging roads, and assumed the obligation of keeping the roads in safe condition, the teamsters not being required to leave their teams and precede the loads over hills and steep places to ascertain if conditions were safe for passage, but where the road men were

---

[1] On the question of the delegability of the master's duty as to places and appliances, see note in 54 L. R. A. 63.

expected to call to teamsters and notify them whether they could safely pass over the way prepared and sanded for their use, the teamsters were entitled to rely on the presumption that the master had performed its duty of keeping the place safe for use.

5. SAME—COMPETENCY.

The competency or incompetency of such road men was not material except as it might throw light on the issue whether they had properly performed their duty.

6. SAME—ASSUMED RISK.

Plaintiff did not assume the risks of driving logs down an incline covered with snow, which both master and servant knew must be prepared by shoveling and sanding to make it reasonably safe: having received the customary notice that the work had been done upon calling to the road man, he did not assume the risk of the master's failure to properly sand the track.

7. SAME—ASSUMPTION OF RISK—CONTRIBUTORY NEGLIGENCE.

Evidence tending to show that plaintiff was injured because 'one of the hills on the logging road had not been sufficiently sanded, and that a team could not guide a load of the size which plaintiff was driving down a hill as steep as this one if the sand had been freshly covered with snow, with evidence pro and con upon the claim of defendant that plaintiff was driving at an excessive rate of speed and the accident was due to plaintiff's negligence, *held*, to present issues for the jury as to his alleged contributory negligence and assumption of risk.

Error to Charlevoix; Mayne, J. Submitted June 2, 1914. (Docket No. 6.) Decided October 2, 1914.

Case by Peter Scoop against the W. H. White Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Harris & Ruegsegger,* for appellant.

*Elisha N. Clink* and *Fitch R. Williams,* for appellee.

STEERE, J. This action was brought by plaintiff in the circuit court of Charlevoix county, to recover dam-

ages from defendant for personal injuries alleged to
have been sustained, on February 28, 1910, through
the latter's negligence, while in its employ as a team-
ster at one of its lumber camps, in Warner township,
Antrim county.  On the trial of said cause a verdict
and judgment were rendered in plaintiff's favor, and
defendant has removed the case to this court for
review, assigning numerous errors, the chief one being
that no *prima facie* case of actionable negligence was
shown by plaintiff's proofs, and the court should have
directed a verdict for defendant.

Defendant was a corporation extensively engaged
in logging and the manufacture of lumber, in the
counties of Charlevoix and Antrim, having its prin-
cipal office in Boyne City, in the latter county.  Plain-
tiff was one of its teamsters engaged in hauling logs
cut at one of its camps in a locality where the logs
were hauled by sleighs a distance of about two miles
on a logging road through a hilly section of country to
a railroad, for further transportation to defendant's
mills.  While driving down one of these hills with a
load of logs, plaintiff was injured by the capsizing of
his load and logs falling upon him.  He was 19 years
of age when injured, and first went to work at this
camp when 16½ years old.  He was an experienced
teamster, and had driven horses regularly when work-
ing in the woods, but mostly at skidding, or moving
logs comparatively short distances from where they
are scattered through the woods as cut to where they
are piled in skidways preparatory to being loaded
upon heavy logging sleighs to be hauled on the main
road to the banking ground.

The road upon which the accident occurred was a
logging road of the usual kind, then in regular use,
constructed in the customary manner for the purpose
of hauling logs in the winter time on sleighs from
the skidways to the banking ground, which in this

case was at the railroad. It was made by cutting and brushing out, leveling, and grading the line about 20 feet wide as a bed for the snow, upon which hauling was done. After the snow fell, the road was broken, or put in condition for use.

To properly prepare a sleigh road for use in hauling heavy loads down steep hills, owing to the difficulty of the teams holding the loads back where it is smooth with packed snow, the snow is shoveled off, and, when occasion requires, sand is shoveled on. While hauling is in progress, men employed for that purpose, called, in the vernacular of the lumber camps, "road monkeys," or "sandmen," are put upon the road to keep it in a fit condition, particularly to shovel off the snow on the hills, where needed, and put sand on the track at intervals, to act as a brake on the runners of the sleighs and thus check the load, or, if there chanced to be too much sand, throw on snow in front of the runners, so that the loads can pass slowly and safely down, without going too fast or getting stuck. This road was thus prepared for use and was in operation, with road monkeys employed along it to keep it in condition.

Plaintiff attributes his accident to a failure to properly sand the hill where it occurred, and alleges, as a ground of negligence, that defendant did not provide him with a reasonably safe place in which to work, nor exercise reasonable care in the construction and maintenance of said road, nor in the employment of competent and trustworthy men to properly sand, care for, and keep said hill in a safe condition, but neglected the same, and permitted the road to remain covered with snow to such an extent that in driving down it, in the performance of his duties, it was impossible for him to keep his team and load under control.

In considering the contention that a verdict should have been directed for defendant, plaintiff's testimony

must be taken as true and regarded in its most favorable light.

Plaintiff claims and introduced testimony tending to show the following facts: At the time he was injured, there were from six to ten teams hauling on this road; one witness, who states there were then six teams hauling, also testifies:

"They had 25 teams, I guess, and all the teams were working on this road."

There were from seven to nine men whose duty it was to keep the road in condition while hauling was in progress; each one having a "beat." Three of these men were usually on duty along the road where it ran down the hill on which plaintiff was injured, to care for and sand the track, owing to the road at that point being steep and crooked. There were three hills in succession; this hill being the center one. The loaded teams in going from the skidways towards the banking ground first came to a smaller hill, which was not sanded, and on reaching its summit the teamsters, who could not see beyond the higher hill ahead, would stop their horses and call to the sandmen supposed to be caring for the steep stretch of road down the further side. When an answering call advised them that it was all right, they would drive on, going rapidly down the slope of the small, unsanded hill in order to make the grade to the top of the next, which was a short distance beyond, then proceeding down the steep road on the other side, where the sleighs were checked by sand thrown on the tracks, without which the horses would be unable to hold back the heavy loads, consisting of from 3,000 to 5,000 feet of logs, which were mostly hardwood. This was the regular method of making the hill. "All the teamsters had to do that."

It is undisputed that the practice of caring for and sanding logging roads at such steep places was custom-

ary and essential to safe and successful log hauling by sleighs. A witness of defendant, with 29 years' experience in woods operations, testifies to the duties of the so-called road monkeys, or sandmen, who are especially employed to keep the roads in a condition safe and suitable for hauling, and says:

"It is customary to sand steep hills where people haul logs down. All lumbermen do that."

It was also customary, after a fall of snow, to shovel off the road on the steep hills and put the track again in condition for safe hauling.

It had snowed two or three inches the night previous to this accident. That morning the teamsters first drove with their empty sleighs along the "come back" road from the camp to the place of loading. After getting their loads, they proceeded with them along the hauling road to the banking ground. Plaintiff testifies that he "was not only the first one over the road"; that his team was gentle and easy to drive; that when he reached the top of the first small hill he stopped and "hollered," and after waiting 10 or 15 minutes he received an answer that the road was all right, when he went ahead, driving down the little hill fast, and, on reaching the top of the second hill, started down it as usual; that he had always done the same thing before, and the other men drove down the first hill the same way he did, but on this occasion, when he came to go down the steep grade of the second hill, his team could not hold the load back, because there was no sand, or not enough sand, on the track; that he was watching the road and held back all he could, but was unable to control his load and team, and they went too fast, resulting in the partial or total upsetting of the load near where there was a curve or turn in the road, throwing him off. Some of the heavy logs fell upon him, causing serious and permanent

injuries. No question is raised by defendant as to his injuries or the amount of the verdict, provided he were entitled to recover. Plaintiff also introduced testimony tending to show that only one man was on the steep and dangerous part of the hill that morning; that the road monkeys were incompetent and negligent; and that the road had not been properly shoveled and sanded when he got the signal that it was all right, and started to go down it.

To the foregoing, defendant introduced contradictory testimony tending to show that in the morning the hill was shoveled and sanded; that three sandmen were distributed along it; that the foreman, Maccabee, went over and inspected the road, finding it in proper condition; that defendant was guilty of no negligence, and the accident, if the fault of any one, was caused by plaintiff's improperly managing his team and driving down the hill too rapidly.

On request of defendant the court submitted to the jury two special questions which, with the answers returned, are as follows:

"Special Question 1: Did Thomas Maccabee, on the morning and before the accident, go over the road in question and inspect its condition and find it properly sanded, in his judgment? No.
"Special Question 2: Did Thomas Maccabee, on the morning of the accident, and before the accident happened, go over the road in question and find all the road men on their respective beats? No."

Under various assignments of error, defendant contends that no *prima facie* case of negligence is shown; that the rule of safe place is not applicable; that, if there was negligence of any one other than plaintiff, it was that of his fellow-servants; that it is not shown that the accident was caused by a failure to sand; that plaintiff assumed the risk; that the verdict and

182 Mich.—35.

answers of the jury to the special questions are against the weight of evidence.

Where the evidence of plaintiff upon a material point is met by that of defendant, the issue is for the jury, but, in passing upon the question of a directed verdict, plaintiff's testimony is to be taken as true, and viewed in its most favorable light, as before stated, and, so viewing it in considering that question, we are unable to accept defendant's contention that the doctrine of safe place does not apply, and defendant, being a common employer, is not liable because the roadmen were fellow-servants with the teamster. Though working for the same employer, those two classes of men were in different and distinct lines of service, one to prepare and maintain a place suitable for the use intended, and the other to use it. The teamsters were not engaged in an employment where it was their duty to prepare their own place in which to work. The roadmen were so well known in the lumbering business as belonging to a special class that those in that service were favored by descriptive, differentiating titles. The duties of the road monkeys, or sandmen, and their relations to the teamsters, were analogous, in many respects, to those of section hands on a railroad and trainmen.

In *Balhoff* v. *Railroad Co.*, 106 Mich. 612 (65 N. W. 594), this court said:

"It is urged that section men and brakemen are fellow-servants, and that for that reason there could be no recovery. The weight of the authority is against this claim. The master owes the duty of furnishing a reasonably safe track, and this is a responsibility from which the company is not relieved by confiding the duty of construction or repairs to competent servants. Such are the master's agents, and their negligence is his negligence. They may be fellow-servants of others engaged in making the repairs, but not of those for whose use and benefit they are made."

It has been more than once, and quite recently, recognized by this court, as a general principle, that where it is the duty of an employee to make or keep a place safe for a fellow employee, and he fails in that duty, his failure is that of the master; the duty being nondelegable. *Kaukola* v. *Mining Co.*, 159 Mich. 689 (124 N. W. 591); *Maki* v. *Copper Co.*, 180 Mich. 624 (147 N. W. 533).

The rule that the duty of the master to provide and maintain a reasonably safe place, according to the nature of the employment, for the servant to perform his work in is nondelegable is too well settled and familiar to call for citation of authority. This is not one of the exceptions sometimes recognized, where the place becomes unsafe as an incident of the work done by plaintiff and his fellow workmen in the same line of labor, and where, by the nature of their contract of hiring, it was their duty to keep the place safe after it was once prepared. The teamsters were not required nor expected to leave their teams and run ahead over the hills to see if the places had become dangerous, and, if so, to make them safe. Defendant had, as was customary in such cases, not only prepared the place, but assumed the duty of keeping it reasonably safe as a place over which to haul logs, and had employed men expressly for that purpose, both to care for it and give warning, with the knowledge that down this particular hill the road grade was steep, crooked, and dangerous, requiring special vigilance, and that the teamsters, as they approached with their loads, could not see its condition until they were just starting down it. We think that, under the circumstances shown, defendant's duty to keep this place reasonably safe, according to surrounding conditions and the nature of the use to which it was put, belonged to the nondelegable class, which is not discharged by

giving directions for its performance. In such case the character and competency of the persons employed to perform the nondelegable duty become immaterial, except as the same may throw some light on the issue of whether or not the duty was performed.

The other questions raised lead more squarely into the realm of disputed facts. That plaintiff assumed the risks normally incident to his contract of hiring, which were or should have been known or noticed by him, is well-settled law. That inherent dangers attended the employment of driving these heavy loads of logs down a steep grade, after all reasonable precautions were taken to make the road safe and keep it so, was presumptively known to him, and he assumed such naturally incidental risks; but it is shown not to be reasonably safe, nor customary, nor practical to haul logs down such an incline on the smooth snow. Plaintiff and defendant both knew that, to make it fairly safe and possible to successfully use the road at that point, it must be especially prepared and maintained by shoveling and sanding, which defendant assumed to do with another class of laborers hired for that purpose, and to notify the approaching teamsters, on inquiry, when it had been so prepared for use. After receiving the customary notice that this had been done, plaintiff did not assume the unknown risk involved in its not having been done. He cannot be supposed to have taken into account, in his contract of hiring, the contingency that he might be injured by an unknown breach of duty on the part of his employer.

Defendant's contention that it is not shown the accident was caused by a failure to sand is necessarily mingled with the claim that the verdict and answers to special questions are against the weight of evidence, for there is testimony tending to show such failure.

Plaintiff testifies:

"There wasn't enough sand so that my team could hold back the load. There was snow. When I arrived at the top of the hill, I couldn't see very far from my load of logs. It was crooked. How far I could see I don't exactly know—possibly 20 feet or more. I did not know that the hill was not sufficiently sanded to enable my team to hold back its load. * * * They told me to come on, so I went. I believed it was properly sanded after they told me it was."

A teamster named Conrad, of six years' experience, who was next behind plaintiff, saw the "mix-up," and stopped his team on top of the hill. After helping care for plaintiff, he went back and proceeded with his load. Of the condition of the track when plaintiff went down it, he testifies:

"It was hilly and crooked and didn't have no sand; didn't have enough sand. * * * They needed sand on the road. After I went back from carrying Peter Scoop, I came back and took my load down to the landing. Before I went over it, they put more sand on it. * * * The team run out of the road because they didn't have no sand to hold back the load."

The only direct testimony to the contrary, which we discover in the record, is that of Thomas Maccabee, the foreman, and his father, Israel, who was working as a road monkey near the foot of this hill. Thomas Maccabee testified as to the methods of preparing and caring for this road generally, and that plaintiff was a competent teamster, though "he drove pretty fast"; that there was no place on the road where it was necessary to trot or run teams down one grade to get up the next; that he went over the road the morning of the accident, and the hill was in proper condition, with three men along it between where the accident happened and the top, one of them being his father, Israel Maccabee. The father, who does not testify to seeing his son go over the road that morning, states he was below where the accident happened and

saw plaintiff coming pretty fast; that, after he made the turn to come down where the accident happened, witness prepared to throw some sand on the road, and says:

"When I raised up I couldn't see the team, and I couldn't see the young man or nothing, * * * and I started to run up there, and the horses had been— they ran out on the snow, * * * and I ran around to see; at the log lying across his legs, and his right shoulder, or his left shoulder was sticking up between the two logs, and this big log * * * was lying on the side of his head."

He further testified the roads were well cared for; that there were seven to nine men between the top of the hill and the landing; that the only one he saw on this hill above him that morning was Chris Ike, who "seemed to take good care of his roads that winter," and who, he since heard, "got blowed up with dynamite," which accounted for his not appearing as a witness. This witness had worked in the woods for many years at "most everything," including building and caring for logging roads that ran up and down hills and gave evidence somewhat in the capacity of an expert. He testified very positively that a team "certainly couldn't" guide sleighs loaded with 3,000 or 4,000 feet of logs down a hill as steep as the one in question, if there was fresh snow on the sand.

Defendant also introduced evidence tending to show that plaintiff was guilty of contributory negligence in reckless driving; that he could and should have guided his horses safely along the road down the hill, but either caused them or allowed them to leave it; that, as shown by a plat introduced and the evidence of those who made the survey, there was no rise in approaching this hill necessitating fast driving to get over it; and much other testimony in contradiction of essential facts testified to by plaintiff's witnesses. This

conflicting testimony fairly raised issues of fact for the jury. They were submitted to the jury by a very careful, clear, full, and impartial charge of the court, in which we discover no reversible error on the material questions of law involved; and a careful reading of the record has not convinced us the verdict is so against the overwhelming weight of evidence as to demand an invasion of the recognized province of the jury, in deciding the issues of fact and demanding cancellation of their findings by setting aside said verdict.

The judgment is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.