GROCHULSKI *v.* PORATH.

MASTER AND SERVANT—PERSONAL INJURIES—DEATH—EVIDENCE—
NEGLIGENCE.

In an action against a master to recover damages for
personal injuries resulting in death sustained by plain-
tiff's intestate, an employee, while hauling dirt to a certain
dumping ground, due to the tipping over of the wagon at
such grounds, evidence *held*, insufficient to show action-
able negligence on the part of defendant.

Error to Wayne; Hally, J.  Submitted January 11,
1917.  (Docket No. 97.)  Decided May 31, 1917.

Case by Michalina Grochulski, administratrix of the
estate of Stanislaus Grochulski, deceased, against
Julius Porath, for the negligent killing of plaintiff's de-
cedent.  Judgment for defendant on a directed verdict.
Plaintiff brings error.  Affirmed.

*Leonard Szynanski,* for appellant.

*John E. Maloney,* for appellee.

STEERE, J.   Plaintiff's intestate suffered fatal in-
juries on August 17, 1913, while in defendant's em-
ploy, resulting from the capsizing of a dirt wagon of
which he was the teamster.  Upon trial of the case in
the circuit court of Wayne county, a verdict was di-
rected for defendant at the conclusion of plaintiff's
testimony, on the ground that the evidence failed to
disclose any actionable negligence on his part.
    Defendant was a contractor engaged in excavating
a sewer along Thirty-Second street in the city of De-
troit, removing the dirt as excavated to a dumping
ground located between McGraw avenue on the south,

Warren avenue on the north, and Campbell avenue on
the west. Dirt from the excavation was being ele-
vated at a so-called shaft on Thirty-Second street some
distance southerly from the dumping ground, and
about 18 teams were engaged in hauling; deceased be-
ing one of the teamsters. The loads were hauled
several blocks northerly along convenient streets un-
til the dumping ground was reached, which was of con-
siderable extent, when they turned upon and drove
over it to the dump, or particular place where the dirt
was then being unloaded. A man was stationed at
the dumping place to level the earth, whose duty it
was, as instructed by the foreman, to direct the
teamsters where to dump their loads. The dump was
changed as conditions required. On the day of the
accident, and for over a week preceding, it was located
near the intersection of McGraw and Campbell ave-
nues, having been changed from a location near War-
ren and Wesson avenues between one and two blocks
farther northwest. Deceased's wagon capsized at or
near the latter place. Different roads, or tracks, led
from adjacent streets, or avenues, across the dumping
ground to these dumps. An employee named Plucin-
ski, who was stationed at the dump on the day of the
accident to do the leveling and direct the teamsters,
where to drive and dump their loads, was called by
plaintiff and examined under Act No. 307, Pub. Acts
1909 (3 Comp. Laws 1915, § 12554). He testified
through an interpreter, giving the only testimony in
the case as to conditions at the dumping ground and
circumstances attending the accident. His testimony
is not always coherent and in some parts self-contra-
dictory. He testified that deceased was injured at
about 11 a. m., when coming with his third load for
that day, about a block and a half away from the
dump at which witness was at work, and not on the
regular or direct route to that dump. On direct ex-

amination, the principal and most material portion of his testimony is as follows:

"When I saw him coming in this time, he came in off Warren avenue. He came in on the road track. Wherever this man showed him, he dumped the dirt over—took it and dumped it over. I showed Mr. Grochulski where to dump this. He had come over that same road twice before that morning, over that same road he dumped. He was a block or a block and a half —there is no streets in between—from Warren avenue when the wagon tipped over. I might have been a block or more away when the wagon tipped over. I went to him as soon as I saw the wagon tip over. The hind heels of the box tipped over, and the front wheels were standing. When I got over to the wagon, Mr. Grochulski laid under the team—under the wagon. The wagon box was turned over. * * * The horses were standing right in front of the wagon. * * * The box was tipped over, the front wheels were turned round and stood fast on the ground, and the box was lying on the ground off from the— As soon as I found Mr. Grochulski, I tried to help him out, I helped him out alone. * * * I went over and got a man that was making a cement walk, and I told this man to call up the ambulance, and the ambulance came and took Mr. Grochulski away. When the wagon tipped it went over on the left side. I didn't see any hole or gutter that the left hind wheel of the wagon went down into or was down in when it tipped over. There was a driveway there made by the wagons, when they go on the empty lot. They used that before they got there for the dump. The wagon tipped a little bit off from the roadway. I looked at the left hind wagon track and saw what the wheel went into at the time the wagon tipped over, and wherever the road was made there, why, I was supposed to fix it up. It was part of my work to see that this roadway was kept level and the ruts filled so that the wagon could be driven over. * * * There was no hole in this roadway at the point where the wagon tipped over, only in the driveway from the traffic. I did not measure the hole down in this gutter that this left hind wheel went into, but it was 10 or 12 inches. I didn't

have any tapeline or anything to measure it with, but it was about the width of the wagon wheel. It was about 10 or 12 inches deep."

On cross-examination, he testified further that, when deceased brought his first load, witness gave him directions and told him not to dump at the old place of dumping, where the accident occurred and where they had formerly been dumping, but to dump where witness was at work leveling; that, when he talked with deceased about it, "he says that he drives the team and I don't. * * * He says he was not coming to the place where I was standing. He dumped near Wesson avenue." After some confused testimony as to locations and routes, witness finally said:

"The point where the accident occurred was not on the regular driveway to the dump where I was working. It was about a block or block and a half away from the regular driveway to the dump where I was working. We had been dumping for seven days before the accident at the spot that I have marked on here near McGraw avenue and Campbell."

It is contended in behalf of plaintiff that the question of defendant's negligence should have been submitted to the jury on the proposition that, in recognition of the dangerous character of the employment of teamsters in driving over this dumping ground, defendant had assumed to keep the driveways they were required to use in a reasonably safe condition by delegating an employee to care for and so keep them, and whether a rut 10 or 12 inches deep was reasonably safe was a question of fact which the court erroneously disposed of as a matter of law.

As to the claimed rut or depression in the driveway, it is contended by defendant, and the trial court so held, that in any aspect of the case its duties as to a safe place for the employee to work only required the exercise of that reasonable degree of provision and

care demanded by the nature of the work being carried on and attending conditions, so that the employee is not exposed to unusual dangers not ordinarily within the obvious scope of his employment, as customarily conducted, and even if there was a rut 10 or 12 inches deep in the temporary driveway leading over a dumping ground, which deceased's duties required him to use, it was but a depression open to common observation, reasonably to be expected at any time in such a road at such a locality, and its existence under the circumstances was not evidence of actionable negligence; that, irrespective of this proposition, the testimony discloses deceased was injured at or near an abandoned dumping ground, where he was directed not to go upon or near a driveway which his duties did not require him to use, which was not the regular driveway to the dump where he was directed to unload, and for that reason no duty rested upon defendant to repair it.

Relying upon Plucinski's testimony that it was part of his work to see that the road "was kept level and the ruts filled so that the wagon could be driven over," plaintiff contends that his failure to fill the rut in question was evidence of failure to perform a nondelegable duty of defendant which raised an issue for the jury under the holding in *Scoop* v. *White Co.*, 182 Mich. 539 (148 N. W. 762). The essential facts calling for the application of the nondelegable duty rule in that case are radically different from the facts in the instant case, amongst them being that the teamster in that case was driving where his duty called him and where he was ordered to drive; that the danger ahead, which was not visible to him as he drove, arose from inability of the teams to hold back large loads of heavy logs while going down a steep hill when the road was not properly sanded, and the "sand men" especially stationed along the hill to care for and sand the road at that inherently dangerous place were re-

quired by an answering call to advise the teamster approaching from the opposite side that the unseen, steep descent ahead was made safe for him to venture down. Relying upon such assurance, the teamster went on and was injured because the road had not been sanded, as the jury found. Here the rut complained of was not upon a road deceased was expected or required to use in the performance of his duties; if made before he drove that way, it was plainly visible to him as he drove along, and no question of losing control of his team was involved, as it stood still where the accident occurred.

We are not cited to, and have been unable to find, any authority which holds, or indicates, under like or analogous facts, that a rut in a temporary driveway of the kind, depth, and under the conditions claimed here, is evidence of actionable negligence on the part of those who made or caused it to be made.

Plucinski's testimony that it was his duty to keep the roadway level and ruts filled in is clouded, as to time when, by his further testimony that they had moved their operations from that locality and he was leveling at another place, where he instructed deceased and others to dump, and which was reached by another way. Taking his statement of his duty, however, as it reads and unqualified, he also testifies that when he went over there he did not see any hole that the left hind wheel of the wagon, which tipped to the left, went down in when it tipped over; that "the wagon tipped a little bit off from the roadway," and "there was no hole in this roadway at the point where the wagon tipped over, only in the driveway from the traffic."

Unquestionably, the numerous conflicting and far from lucid statements in his testimony relative to material facts, presumably within his knowledge, give rise to uncertainty as to what he actually knew or

meant to say; but, considering Plucinski's testimony as a whole in its strongest and most favorable light for plaintiff, upon whom rests the burden of proof, we cannot but agree with the conclusions reached by the learned circuit judge that it fails to disclose the essential facts requisite to sustain a *prima facie* case of actionable negligence.

The judgment is therefore affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.