SUNDIN et al. v. EDWARD RUTLEDGE TIMBER CO.

(Circuit Court of Appeals, Ninth Circuit. April 1, 1918. Rehearing Denied May 13, 1918.)

No. 3049.

1. MASTER AND SERVANT ⬤⟶185(15)—INJURIES TO SERVANT—FELLOW SERVANT.

Where lumber was loaded on mill cars by one gang of men, and the cars were moved by another gang, negligence in loading the lumber cannot, as to the second gang, be deemed the negligence of a fellow servant, but must be deemed the failure of the defendant master to furnish the second gang with reasonably safe place in which, or reasonably safe appliances with which, to work.

2. MASTER AND SERVANT ⬤⟶288(1), 289(1)—INJURIES TO SERVANT—ACTIONS—EVIDENCE.

In an action for the death of an employé of a lumber company, killed when a load of planks fell from a car which the employé and others were moving, the question of the employé's contributory negligence and assumption of risk *held*, under the evidence, for the jury.

In Error to the District Court of the United States for the Northern Division of the District of Idaho; Frank S. Dietrich, Judge.

Action by Olga Sundin and others, widow and minor children of Alex Sundin, deceased, against the Edward Rutledge Timber Company, a corporation. There was a judgment for defendant, and plaintiffs bring error. Reversed and remanded for new trial.

The widow and children of Alex Sundin brought an action in the court below to recover damages for his death, which occurred while he was in the employment of the defendant in error, herein to be named the defendant. The defendant was conducting a large sawmill, with lumber yards, tracks, and cars. The lumber was carried from the mill by means of an endless chain conveyor to a point where it was taken and loaded upon mill cars. This was done by a gang known as the chain men. After the cars were loaded, another gang, known as the transfer gang, shoved the cars by hand power out along and upon short tracks a distance of 22 feet, where they ran them upon another car, carrying two sets of transverse tracks and standing upon a track at right angles with the short transfer tracks. Thereafter the transfer car, carrying the loaded mill cars, would be conveyed out into the yards of the company, where the lumber was stacked by another gang. Sundin was, and for six weeks prior to the accident had been, a member of the transfer gang. That gang performed no work other than to take the mill cars, after they had been loaded by the chain men, out into the yards as described, and it had nothing to do with loading the lumber on the mill cars. There was a foreman in control of the chain men, the transfer gang, and the lumber pilers. The mill cars were 8 feet long, 4 feet wide, and the platform thereof stood 2 feet above the track. The death of Sundin was caused by a load of lumber falling upon him while he was assisting in moving along one of the short tracks a mill car which had been loaded by the chain men. That load consisted of 8 tiers of about 50 boards, each 6 inches wide, about an inch thick, and 16 feet long. In loading the lumber upon the mill cars, the custom was, and the defendant so ordered, to place between the layers of lumber, crosspieces of lath to bind the load and prevent any part thereof from falling off while the same was being moved out to and upon the transfer car and into the yards. The load of lumber which fell and caused Sundin's death was provided with no crosspieces or binders, the chain men having omitted to comply with

their duty in that respect. The movement of each mill car required the services of four men. Sundin was working with three others. There were 68 of the short tracks extending out to the transfer car track. Other cars stood on either side of the track on which Sundin was working when the accident occurred. There was not room for four men to push the car from the rear end. There was evidence that it was customary and proper for one of the four to take hold of the side of the car, with his back to it, as soon as the car emerged from between the cars which stood on either side thereof. Sundin did this, and all four men continued moving the car until it reached the rails of the transfer car. Owing to the sinking of the short track, so that it was about an inch and a half lower than the rails on the transfer car, the men were unable to move the mill car onto the transfer car, and were obliged at least twice to bring their loaded car back a few feet, so as to get increased momentum. While doing this the load collapsed, and about 100 boards fell upon Sundin. The court below instructed the jury to return a verdict for the defendant, on the ground that the negligence complained of was the act of a fellow servant, and on the further ground that the deceased assumed the risk of the accident which caused his death.

Plummer & Lavin, of Spokane, Wash., and Black & Wernette, of Cœur d'Alene, Idaho, for plaintiffs in error.

Ralph S. Nelson, of Cœur d'Alene, Idaho, for defendant in error.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] The principal question in the case is whether or not it should be held that the failure to load the car properly was the neglect of Sundin's fellow servants, for which the defendant was not responsible. The rule is well settled that the master is not answerable for injuries to employés resulting from misuse or nonuse of instrumentalities by other employés, and that, if he furnish his employés with suitable appliances and materials with which to do their work in safety, he will not be liable for an injury which results from the use of defective materials or defective appliances. We are inclined to the view that the present case does not fall within those rules, and that the master's duty to furnish his employé a safe place in which to work, and safe appliances to work with, was sufficiently comprehensive to include the duty to furnish the servant, who was injured in this case, cars properly loaded with which to perform the sole service which he was employed to render, the transportation of mill cars loaded with lumber, for with that service Sundin's duties began and ended.

The court below, in instructing the jury to return a verdict for the defendant, used for illustration the case of two workmen engaged in loading hay upon a wagon; the one upon the wagon stowing the hay in such a careless way that it falls upon the man below, who is pitching the hay on the load. In such a case, the court said, the employer would not be responsible, because he could not anticipate that one of the men was going to be negligent. We cannot agree that the illustration presents the situation found in the record here. The men who worked in moving the loaded mill cars had nothing to do with loading the same. They had no opportunity of observing the work of those who loaded them, or of influencing their action. They were required to take the cars as they found them standing upon the track and already loaded.

In Port Blakely Mill Co. v. Garrett, 97 Fed. 537, 38 C. C. A. 342, this court approved the instruction of the trial court that:

"It was the duty of the defendant in this case to inspect all the cars in that train, including this car upon which the lumber was loaded, and see, before it went out upon a run, that they were in safe condition for operation. And, when I speak of the car upon which the lumber was loaded, it is to be understood as including, not only the platform itself, and the trucks and running gear, but the side stakes, which were required to hold the lumber in place, and keep it from shaking off or being toppled off. That obligation is one which the defendant company owed to all of its employés, including Hugh Garrett, and it cannot be relieved from responsibility and liability by showing that, if there was anything wrong about that car, it was negligence of a coemployé of Hugh Garrett."

In that case the accident resulted from defective stakes, which had been inserted in iron sockets on either side of a flat car to keep the lumber in place. We can see no difference in principle between that case and this. The stakes in that case and the strips of lath in this served the same purpose of holding the load on the car. No distinction should be made from the fact that in the Garrett Case the flat car was 30 feet long, and the lumber was carried 38 miles, whereas in this case the car was but 8 feet long, and was carried a distance of only 22 feet to the transfer car, and thereafter a distance of perhaps 300 feet. In the former case we said:

"It is a well-established rule, in the doctrine of master and servant, that it is the duty of the master to provide a reasonably safe place for the servant to work in, and to furnish reasonably safe and adequate appliances or instrumentalities for the servant's use."

And we answered the contention that the defendant in that case had supplied proper material for stakes, and that putting them in place was the work of the car loader, who was a fellow servant of the deceased, by saying:

"If the act from which an injury arises is one pertaining to the duty which, under the law, the master owes to his servants, he is responsible to them for the manner of its performance, and is not excused from liability to an employé for an injury caused by the negligence of a fellow servant unless he himself has done his full duty."

And we held that it was the duty of the defendant to see that the lumber car was in safe condition for operation before it was put into service, and that the delegation of this duty to a fellow servant of the deceased did not relieve the master from liability. Similar decisions are Pennsylvania R. Co. v. La Rue, 81 Fed. 148, 27 C. C. A. 363; McIntyre v. Boston & Maine Railroad, 163 Mass. 189, 39 N. E. 1012; Scoop v. W. H. White Co., 182 Mich. 539, 148 N. W. 762; Cummins v. Sparks Co., 173 Ky. 803, 191 S. W. 515; Gaudie v. Northern Lumber Co., 34 Wash. 34, 74 Pac. 1009; Dumas v. Walville Lumber Co., 64 Wash. 381, 116 Pac. 1091; Mattson v. Eureka Cedar Lumber Co., 79 Wash. 266, 140 Pac. 377.

[2] The questions of assumption of risk and of contributory negligence, we think, should have been submitted to the jury. There was no evidence of a rule of the company that the transfer men should not take hold of the car at the side. The evidence goes no further

than to show that the foreman, when he saw that a load was not piled straight and in such a way as not to be safe, would tell the men to keep away from the side which he thought unsafe, but there was no evidence that a load properly bound with strips of lath was in danger of collapsing, or had ever fallen from a car. There was no evidence that a load such as this which fell upon Sundin had ever before been piled upon any car without the use of the crosspieces. It is suggested that, if Sundin had looked at the load, he could have seen that there were no binding crosspieces in it. But the evidence was that the strips of lath were inconspicuous, and that often they did not emerge from the sides of the load, and we think a court would not be justified in holding that each member of the transfer gang, before taking hold of loaded cars under the directions of the foreman, was bound to stop and inspect each load, to see if the boards had been properly bound together by crosspieces. When the foreman told these four men to take out this particular car, they had the right, we think, to assume that the car was safe to handle, and that the order of the foreman, together with the general known method of loading, were assurance to them of that fact. The defect in the manner of loading the car does not seem to have been obvious, for neither the foreman nor any of the transfer gang observed it.

The judgment is reversed, and the cause is remanded for a new trial.