## MINA ALPERN v. WORTHY L. CHURCHILL ET AL.

*Proof of negligence—Sparks from burner—Use of property.*

1. Negligence must be affirmatively proved; but, like other facts, it may be shown by irresistible inference from circumstances.

2. Where, in an action for injury caused by sparks from a burner, there was evidence that warranted the inference that the burner was in a defective condition, it was proper to show that when a change had been made after the damage was done, the dangerous emission of sparks ceased.

3. Negligence implies fault, and cannot be predicated of a lawful and customary use of one's own premises.

4. Contributory negligence cannot be predicated of the erection, in a customary, lawful and proper manner, of buildings constructed of the usual material upon the owner's premises, even though there are establishments in the neighborhood from which there is risk of fire or damage. And the owner of such buildings is not bound to incur the expense of providing his buildings with extra safeguards.

Error to Alpena. (Emerick, J.) April 16.—June 4.

CASE. Plaintiff brings error. Reversed.

*Turnbull & Dafoe* for appellant.

*Clayberg & Sleator* for appellee.

COOLEY, C. J. Action on the case for a negligent injury by fire, alleged to have been communicated from defendants' premises.

It seems that in 1877 defendants, being the owners and in

| | |
|---|---|
| 53 | 607 |
| 60 | 370 |
| 61 | 593 |
| 53 | 607 |
| 88 | 644 |
| 89 | 527 |
| 53 | 607 |
| 100 | 24 |
| 53 | 607 |
| 104 | 311 |
| 53 | 607 |
| 109 | 6 |
| 53 | 607 |
| 113 | 589 |
| 53 | 607 |
| 122 | 449 |
| 53 | 607 |
| s19NW | 549 |
| 129 | 606 |
| 53 | 607 |
| f155 | 1 76 |

possession of certain premises in the city of Alpena, and operating a steam saw-mill thereon, for the purpose of consuming the refuse matter arising from the manufacture of lumber, such as slabs, saw-dust, &c., erected upon such premises a refuse burner, so called. Its general dimensions and description seem to be as follows: The base is cylindrical in form, and twenty-two feet in diameter inside. This diameter continues up some forty-one feet from the ground. From this point up thirty-eight feet it is conical in form, tapering from a diameter of twenty-two feet to a diameter of eight feet. From this point it again assumes a cylindrical shape eight feet in diameter for some eighteen feet higher. All this is made of iron. Surmounting this structure is a wire bonnet or spark-arrester, constructed of woven wire, with a 4 x 4 mesh, or sixteen holes to the square inch. This spark-catcher continues the diameter of eight feet for about eight feet higher, when it terminates in a cone, the apex of which is about two feet higher than the sides. There are no holes in the top, except the mesh as above referred to, the conical bonnet covering the entire structure. The apertures in the bonnet are about one-eighth and one-sixteenth of an inch square. The sparks which escape are freed at an altitude of about 105 to 107 feet from the ground.

Somewhat northeast of this refuse-burner, and at from 300 to 350 feet distant therefrom, plaintiff's premises were situated, and they are described by plaintiff's husband about as follows: They consisted of a boarding-house, a packing-house, and an ice-house. The frontage was upon Thunder Bay river, and they extended back toward Water street, and their southerly line, if produced, would have intersected Water street from one to two hundred feet north of a line drawn from the northerly side of the refuse-burner. The boarding-house, which was built in 1879, was the most northerly of the buildings, and farthest from the burner. Its dimensions were 50 feet long by 20 feet wide, and two stories high. It was a frame building, clapboarded and painted outside, ceiled inside, and having a shingle roof. Next adjoining and nearer the burner, and also facing the river,

was the packing-house. This was built in 1881. It was 70 feet long by 20 feet wide, having 22-feet posts, making it two and one-half stories high; the lower story being used for packing fish, the second story being used for stowing nets, seaming on nets, and doing work connected with nets; the upper floor being used as a store-room for everything connected with the fishing business. It was a wooden building, unpainted, and having a shingled roof. Commencing immediately in the rear of this packing-house, and extending back towards Water street, was situated the ice-house, of the following dimensions: 102 feet long, 30 feet wide, with 20-feet posts. It was sheeted inside, clapboarded outside, with a shingle roof, and unpainted. This was erected in the winter of 1877-78. The fire is alleged to have started about midway on the roof of the ice-house nearest the burner, and evidence was given tending to show that at the time of the fire the wind was blowing from the direction of the burner. Immediately south of the plaintiff's said premises, and about 60 or 75 feet distant, is situated a steam shingle mill, having a smoke-stack or chimney covered by a spark-catcher. There were also two chimneys or smoke-stacks used with defendants' mill, and located a little southeasterly from the refuse-burner.

The declaration contains six counts. The first alleges that defendants "negligently suffered the tops of said chimneys and refuse-burner to remain open without proper and sufficient spark-catchers or other contrivances therein, and without using any adequate means to prevent the escape of said sparks from said chimneys, refuse-burners, and fires as aforesaid."

The second count alleges that defendants "negligently suffered said chimneys and said refuse-burner to remain of insufficient height, and the tops thereof to remain open without proper catchers thereon, and without using any adequate means to prevent the escape of sparks from said chimneys and said refuse-burner, and suffered said mill to be operated and run in an unskillful and imprudent manner."

The third count alleges that defendants "negligently suf-

fered the said refuse-burner to continue and remain of insufficient height, and without a proper or sufficient spark-catcher on the top of the same, and negligently allowed large quantities of sparks of fire to be emitted from the top of said refuse-burner."

The fourth count alleges that defendants "negligently suffered sparks of fire to escape from their said mill," which is preceded by an allegation that defendants "did not or would not use reasonable and necessary precautions to prevent the escape of said sparks of fire from their said mill."

The fifth count alleges that "defendants persisted in thus operating and running their said mill with said fires, chimneys, and refuse-burner in a careless and negligent manner as aforesaid, and without taking proper and reasonable means and precautions to prevent said danger to plaintiff's said buildings and other said buildings near said mill, and to prevent said sparks from escaping from said mill chimneys and refuse-burner, and falling upon plaintiff's said buildings;" and that "said damage and destruction was caused by the negligence of said defendants in operating their said mill, and of their neglect to take such precautions as aforesaid."

The sixth count alleges that "divers sparks and brands of fire escaped and were thrown from their said mill by and through the mere carelessness and negligence in operating and running their said mill."

The following statement presents the substance of evidence given on the trial:

Joseph Ross was at work at Masters & Folkert's shingle-mill, in July, 1882, when the fire occurred. The shingle-mill was 60 to 75 feet from plaintiff's buildings. The fire caught in the center of the roof of the ice-house. During the same summer, at different times, witness had seen cinders or live sparks falling from the burner and catching around that shingle-mill; perhaps half a dozen times: had also seen the same thing the year before, and at one time, standing with George Robinson in front of Masters & Folkert's office a live cinder fell at their feet. The wind was then in the direction of de-

fendants' burner. Defendants' smoke-stacks were covered the same all the season of 1882. At the time of the fire the burner had a round-top spark-catcher, caved in at the top. It was not so badly caved in the previous season. In the previous season witness saw live sparks from the burner catch. in the boarding-house of defendants. There was a time in that season when the defendants' smoke-stacks had no fire-arresters on them. The witness did not know whether that was or was not the time when the fire caught in the boarding-house.

John Broker, who also worked at the shingle-mill, testified to other fires having been started by sparks from the burner.

Charles Parks, while working in the shingle-mill in 1880, had seen fires started by sparks from defendants' burner at least five times. He had also, in 1880, seen several fires started by sparks from defendants' mill, but did not notice whether they came from the burner or from the smoke-stacks.

George Robinson testified that he run the shingle-mill from 1877 to 1882; that from 1877 to 1881 the burner and spark-catcher remained in the same general condition; that every time the wind would blow from the south he would see large live sparks fall to the ground ; this would be from the direction of the burner; there would be no sparks when the wind was not very strong: the sparks came from the burner about the same in 1880 and 1881 : one morning when the wind was blowing pretty strong, and the sparks were lighting up fires, he told H. D. Churchill that his burner was lighting fires, and Churchill said he would stop it; he would shut the draft. He did shut the draft and the sparks stopped. This was in the fall of 1881.

Other evidence was given which bore in the same direction. The plaintiff also offered to show that after the fire defendants changed the burner and spark-catcher, and since that time there had been no fire. The proposed evidence was objected to and excluded.

When the evidence was in, counsel for the defendants requested the court to instruct the jury to return a verdict in their favor, for reasons stated in the record as follows: "We think, upon the part of the defendants, that there is no testi-

mony to submit to the jury upon the case alleged in the declaration. I think we have the right to raise the question by moving to strike out the evidence of value. There are three grounds upon which the counsel sought to sustain his case, under his declaration. One is the insufficiency of the spark-catcher; the second is the improper running of the mill; the third is insufficient height of the spark-catcher. There is no evidence that the sparks arose from improper running of the mill, or came from the mill. So far as the evidence shows, they came from the burner. Secondly, there is no evidence before the court that the height of Mr. Churchill's is not sufficient: and we are remitted, I think, in this case to the question whether there is any evidence that the spark-catcher is insufficient, or in bad condition, or improperly constructed, at the time of the fire. In other words, whether we did negligently suffer the tops of the chimneys and refuse-burner to remain open without proper or sufficient spark-catcher, or other contrivances, thereon, and without using any adequate means to prevent the escape of sparks. The counsel has offered some evidence, which your Honor admitted, for the purpose of showing, and which has a tendency to show, and upon that point, I think, the counsel has a right to go to the jury, as to whether or not the fire did actually catch from sparks emitted from the burner of the defendants. Prima facie, the plaintiff has made out a case tending to show that this fire did originate from the sparks from the burner of the defendants; but this, of course, does not make out a case against the defendants, because, certainly, the defendants had a right to run their burner."

The court acceded to this view, and a verdict was taken for defendants accordingly.

By the instruction the case was made to turn upon the question whether there was any evidence tending to show negligence in the defendants in the use of an imperfect or insufficient spark-catcher. The circuit judge thought there was no such evidence. Proof that the injury probably resulted from sparks emitted from the burner was ample, but the judge was of opinion that this was insufficient to

establish a liability unless there was some affirmative show-
ing of negligence, beyond what might be inferred from the
injury itself. And this as a general principle is no doubt
true; the party counting upon negligence must adduce affir-
mative proof of it. *Lake Shore etc. R. R. Co. v. Miller* 25
Mich. 274; *Macomber v. Nichols* 34 Mich. 212; *Grand Rap-
ids etc. R. R. Co. v. Judson* 34 Mich. 507; *Brown v. Street
Railway Co.* 49 Mich. 153. But we are not satisfied that
there was in this case such an absence of evidence as the
judge supposed. Negligence, like any other fact, may be
inferred from the circumstances; and the case may be such
that, though there be no positive proof that defendant
has been guilty of any neglect of duty, the inference of neg-
ligence would be irresistible. Such a case is seen in *Higgins
v. Dewey* 107 Mass. 494, a case of fire set for the burning of
brush on agricultural lands. See also *Kearney v. London
etc. Ry. Co.* L. R. 6 Q. B. 759; *Field v. N. Y. Cent. R.
R. Co.* 32 N. Y. 339.

Now what are the facts in this case? The defendants con-
structed, in connection with their mill, a burner, whereby
they might be enabled to consume and get rid of the waste
and refuse stuff of their business. The burner, as we under-
stand it, was not a necessity to their business, but it was con-
structed as a means of saving something in the cost of
removing sawdust, slabs, etc. It was what may be described
as a tall and very large chimney, and the draught through it,
when a fire was burning, was very strong and powerful.
Only a very perfect spark-arrester could prevent a stream of
large cinders pouring out of it when the draft was open.
The evidence was strong that fires were frequently started
by cinders which came from it; that such an occurrence
might reasonably be looked for whenever a strong wind was
blowing. The sparks, so-called, which ignited the plaintiff's
building, could not have been mere sparks: a spark could
scarcely have retained sufficient vitality and substance, after
being carried that distance, to communicate fire to a building.
It was in proof that the spark-catcher was bent in at the top,
as a consequence of the heat; and though there was no direct

evidence that any wires were broken, or the openings in it increased, the very manner in which the sparks poured out of it, and started fires at a distance, would suggest, if it did not fully justify, an inference that, in some way, it was defective; and such an inference might have been fully warranted if the plaintiff had shown, as she offered to do, and as she should have been permitted to do, that after a change was made in the spark-catcher immediately following the fire, the dangerous emission of sparks through it ceased altogether. But the evidence the plaintiff gave was precisely such as, in *Lehigh Valley R. R. Co. v. McKeen* 90 Penn. St. 122, was held to require the court to submit the case to the jury.

But it is said on behalf of the defendants that the plaintiff was guilty of contributory negligence, and for that reason, if for no other, the verdict should be permitted to stand. The contributory negligence suggested is that the plaintiff erected her buildings within a hundred yards or so of defendants' mill, after this dangerous burner had been put up, and did not cover them with metallic roofs. It is not suggested that the buildings were exceptionally combustible, or that the roofs were of different material to that made use of by the plaintiff's neighbors; but it is said that, in view of the danger to which she was exposed from the burner, she should have incurred the extra expense of a metallic roof for protection, and was negligent in not doing so. This strikes us as a most extraordinary proposition. The defendants, not because it is a necessity to their business, but as a means of saving expense in getting rid of the refuse, erect this dangerous burner, and having done so, it is argued that by this contrivance of money-saving to themselves they have imposed a burden upon all the property in the neighborhood, and subjected all lot-owners to the necessity of incurring extra expense in any future erections which they may make in the vicinity. To state the argument baldly, it seems to be that by erecting a neighborhood nuisance to save cost to themselves, the defendants have imposed upon everybody in the neighborhood an obligation of expense for pro-

tection against it, so that no one can be permitted to complain of the nuisance who declines to incur this expense. We are aware of no principle of law which will justify this species of economy at the expense of others. In *Beauchamp v. Saginaw Mining Co.* 50 Mich. 163 it was suggested that the defendant could not afford to take certain precautions in the management of its business, which seemed necessary for the protection of the public; but the Court was of opinion that if the business at the particular place could not be profitably carried on, and the rights of third parties at the same time respected and protected, then it must either be carried on at a loss or abandoned. And this, we still think, is perfectly reasonable.

The plaintiff owned a city lot, upon which she had erected buildings of the materials most in use, covering them in the usual way. Surely there was no negligence in this: she was simply dealing with her own property in a customary and perfectly lawful way, interfering with no one else, and neglecting no duty. If defendants can limit her right to improve in the customary way, by their own erections, then they have superior rights to others, and their tenement dominates the neighborhood. There is no basis for a suggestion of contributory negligence in the case. Negligence implies fault; and there can be no fault in a perfectly lawful and customary use of one's own premises.

A new trial must be ordered.

The other Justices concurred.