*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JAMES R. BELLEFEUIL,

        Plaintiff-Appellant/Cross-Appellee,

v,

JULIE M. WILSON,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
August 24, 2023

No. 361494
Kent Circuit Court
LC No. 20-002707-NZ

Before: GLEICHER, C.J., and RICK and MALDONADO, JJ.

PER CURIAM.

In this action for intentional infliction of emotional distress (IIED), plaintiff James Bellefeuil alleges that defendant Julie Wilson coached their daughter, LBW, to falsely accuse Bellefeuil of child sexual abuse. LBW's allegations launched lengthy child welfare and criminal investigations that abruptly ended 15 months later with LBW's recantation. Bellefeuil brought this suit and Wilson sought summary disposition contending that Bellefeuil's evidence of coaching was insufficient to create a genuine issue of material fact. The circuit court agreed with Wilson. We reverse and remand for further proceedings.

## I. BACKGROUND FACTS

Bellefeuil and Wilson married in 2009 and divorced in 2010, but continued living together. LBW was born in 2013. After the couple had twins in 2016, their relationship deteriorated. By April 2017, they contemplated a separation. Wilson retained counsel and sought child support of more than $40,000 per month based on Bellefeuil's multi-million-dollar annual income. At that time Wilson was unemployed and financially dependent on Bellefeuil. Bellefeuil, too, retained counsel.

Two months into the parties' dissolution negotiations, Bellefeuil took four-year-old LBW to his parents' log cabin in the Upper Peninsula. Bellefeuil's mother, stepfather and other family members were present throughout the visit. Wilson approved of the trip; indeed, Bellefeuil claims that she suggested it. In testimony later provided to a private arbitrator selected by the parties

under the Domestic Relations Arbitration Act, MCL 600.5070, *et seq*.,[1] Bellefeuil described that everyone enjoyed the trip and that LBW spoke to Wilson by phone every evening. The arbitrator's report continues:

> Mr. Bellefeuil and [LBW] returned home on Friday, July 21, 2017. One of their nannies, Chris McKearney, testified that [LBW] was very happy and cheerful when they returned home . . . . According to her, [LBW] said she had a great time in the Upper Peninsula.

> Chris McKearney was also present at [LBW's] birthday party on Sunday, July 23, 2017. She said [LBW] was very happy and excited at her birthday party. She observed no aberrant behavior from [LBW] during the party.

The next day, while being bathed by Wilson, LBW allegedly disclosed that Bellefeuil had committed multiple forms of sexual and physical abuse while the two vacationed in the Upper Peninsula. This "disclosure" is at the heart of Bellefeuil's intentional infliction of emotional distress claim.

Bellefeuil maintains that it was unusual for Wilson to bathe LBW, and that she did so after telling the evening nanny to go home. Wilson brought her smartphone into the bathroom and engaged in a conversation with LBW about "what your daddy did up north." At some point during that conversation, Wilson began videotaping with her phone. A transcript of the videotaped portion is in the record; we include it here in its entirety because in our view, some of Wilson's leading questions are consistent with coaching. We have italicized the most obvious and egregious examples:

> WILSON: All right. So tell me again. Daddy put - - so tell me what your daddy did up north.

> LBW: He hit me lot.

> WILSON: And hit where - - what did he do with his hands? Where did he put them?

> LBW: On my - - up here.

> WILSON: He spanked you on your privates?

> LBW: Yeah. I didn't do anything bad up there.

> WILSON: *You didn't do anything bad and he spanked you anyway on your privates*?

---

[1] Much of the evidence provided in support of and opposition to Wilson's motion for summary disposition was contained in the transcripts of the arbitration hearing.

LBW:  Uh-huh.

WILSON:  *And then what did he do with his finger?*

LBW:  *He put it in - - he put - - and then he hit me right in the head.*

WILSON:  Okay.

LBW:  That's not very good.  He - -

WILSON:  He hit your head?  *And then he put his finger in your - - where did he put his finger?*

LBW:  Over here and here where my poop comes out of.

WILSON:  Where your poopy comes out of?

LBW:  Like right here.

WILSON:  And how far up did he put it?

LBW:  Like very far up.  Like - -

WILSON:  Did it hurt?

LBW:  He put it in here where my poop.

WILSON:  Did it hurt?

LBW:  It did.

WILSON:  Did you tell him to stop?

LBW:  I didn't, and he keep doing it and doing it and doing it and doing it.

WILSON:  What was he doing while he did it?

LBW:  He was peeing on me.

WILSON:  He was peeing on you?

LBW:  Uh-huh.  And I peed there too upstairs on the bathroom, but Dad cleaned it up.

WILSON:  But what?

LBW:  But Dad cleaned it up.

WILSON:  Daddy cleaned it up after you peed on the floor?

-3-

LBW:  Uh-huh.

WILSON:  And he told you what - - what did he tell you he would do if your told me?

LBW:  He would spank me.

WILSON:  *You said how many times before he's done this*?

LBW:  So many times.  (Inaudible).

WILSON:  I know, honey.  How many times before has he done this to you?  Once?

LBW:  A lot of times.

WILSON:  A lot of times?  Does it make you feel good or does it make you feel bad?

LBW:  It makes me feel bad.

WILSON:  Okay.

LBW:  (Inaudible).

WILSON:  *When he was peeing on you, honey, was it white?*

LBW:  *It was black.*

WILSON:  *It was black.*

LBW:  Uh-huh.

WILSON:  Well that doesn't make any sense.  Honey, look at me.  Are you telling the truth?

LBW:  Yeah.  And then he spanked me right in my ear.

WILSON:  Why did he hit you on your ear?  He told you not to tell anyone? *[LBW], did he put anything in your mouth?*

LBW:  He put some paper in my mouth.  He put paper in my mouth.

WILSON:  Why?

LBW:  Because he was - - he was going to poop in my mouth.

WILSON:  He wanted you to be quiet or what?

-4-

LBW:  He wanted to poop in my mouth.  I said no, and he did it anyways.

WILSON:  He pooped in your mouth?

LBW:  Uh-huh.

WILSON:  And what did you do?  Did you throw up or what?

LBW:  I throwed up.

WILSON:  Where?

LBW:  Outside.  Outside, mom.  Outside.

WILSON:  [LBW], are you making this up, babe?

LBW:  I'm not.

WILSON:  You're not making it up?

LBW:  Uh-huh.  It happened.

WILSON:  It happened what?

LBW:  It happened.  We didn't know.

WILSON:  It really happened.  Okay.  And how many times has it happened?

LBW:  A lot of times.  A lot of times, mama.

WILSON:  What does he put in your mouth, baby doll?

LBW:  He put poop in my mouth, and then it was in my mouth and I swallowed it, and he made me swallow it.

WILSON:  *Has he put his penis in your mouth?*

LBW:  *Peanuts?*

WILSON:  *Huh?*

LBW:  *Peanuts?*

WILSON:  *You know what he pees from?*

LBW:  *No.*

WILSON:  *You know what he pees from, what Daddy pees from?*

LBW: *No.*

WILSON: *Has he put that in your mouth or near your privates or anything like that?*

LBW: *He put it in my - - in my mouth.*

WILSON: He did?

LBW: Uh-huh.

WILSON: When did he do that?

LBW: Like up north. Like - - (inaudible) - - that he did that.

WILSON: Up north?

LBW: Uh-huh.

WILSON: Okay. Just this time when you were up north?

LBW: A lot of times.

WILSON: A lot of times. Okay. Does it make you feel good or make you feel bad?

LBW: It make me feel bad.

WILSON: Do you tell him you don't want to do it?

LBW: Well, he make me drink his pee pee.

WILSON: Okay, does it taste bad?

LBW: Yeah.

WILSON: Okay, honey. *Do you have anything else you want to tell me about him smacking your privates or putting his finger in your butt*?

LBW: He touched my toenails and he pooped on my toenails and all over my face, mama. That's it. He put every poop that he pooped that he had pooped all over my face. Mama, and I was really sad. I don't like it.

WILSON: All right, honey. Thanks for telling, me, okay?

LBW: Okay.

WILSON: All right. Bye.

LBW: Bye.

WILSON: Can you say bye? Are you sure you're telling me the truth? It happened?

LBW: It happened. We - - I don't like it.

WILSON: You don't like it. What does he tell you that if you tell mommy will happen? What does he say?

LBW: He said he would spank me in the private.

WILSON: All right. All right, honey. Thanks for telling me. Will you tell me if it happens again? You won't get in any trouble. I won't tell him, I promise you, okay?

LBW: You won't tell him?

WILSON: I won't tell him. I want you to tell me if he does anything to your private parts, okay, or puts anything in your mouth, okay?

LBW: Okay.

WILSON: Okay. I love you so much.

LBW: I love you too. Bye. [Emphasis added.]

After videotaping her conversation with LBW, Wilson inexplicably asked Bellefeuil to kiss LBW goodnight. The next day, Wilson took LBW to a medical examination where the doctors called Child Protective Services (CPS). CPS visited the home and requested that Bellefeuil leave. About a week later, Wilson filed for child support in the amount of $44,000 per month.

Bellefeuil remained out of the home for 15 months while two investigations, one brought by CPS and the other by the Kent County prosecutor, proceeded. During the investigations Wilson accused Bellefeuil of possessing child pornography; this accusation was rejected after the police searched Bellefeuil's devices. Bellefeuil steadfastly denied that he had abused his daughter and from the outset maintained that Wilson had coached LBW to make the accusations. He was never arrested.[2]

Meanwhile, LBW underwent several interviews and examinations. No physical evidence of abuse was detected. At one of the forensic interviews LBW stated that Bellefeuil had hurt her

_____

[2] Regarding the CPS investigation and the 15 months that elapsed before Bellefeuil was allowed to move back into his home, the arbitrator commented: "The ineptitude of the investigation of this claim in this case is inexcusable, and the length of time taken to right this wrong is an embarrassment to our legal system. MDHHS essentially admitted their error by removing Mr. Bellefeuil from the Central Registry."

"with a yellow hammer on [her] butt," and recapitulated that he had "pooped" and "peed" on her. The nannies interviewed by CPS strongly disagreed with the notion that Bellefeuil had abused LBW. They described a normal and healthy father-daughter relationship, and expressed their opinions that LBW was much more firmly bonded to her father than her mother. One described Bellefeuil as LBW's "primary caretaker." Indeed, when told of Bellefeuil's removal from the home one nanny remarked, "you removed the wrong parent."

LBW recanted her statements in October 2018. The circumstances surrounding the recantation are not included in the record. Both the child protective and criminal investigations were quickly abandoned, and Bellefeuil's name was removed from the CPS registry. The arbitrator summarized:

> [F]rom a legal standpoint the evidence is overwhelming that no sexual abuse occurred. Put another way, there is no evidence that the alleged sexual abuse occurred that would satisfy proof beyond a reasonable doubt, proof by clear and convincing evidence, proof by a preponderance of the evidence, or even probable cause.

The arbitrator found a "distinct possibility that the[] disclosures were the result of Mrs. Wilson intentionally [']coaching' or 'suggesting' to [LBW] that this event occurred[.]" A guardian ad litem (GAL) appointed for LBW during the custody proceedings recounted LBW's statement that she did not remember Bellefeuil spanking her, but that her mother told her that it happened. The GAL opined that Wilson had coached LBW to falsely accuse Bellefeuil of sexual abuse.

Bellefeuil sued Wilson alleging IIED. Wilson moved for summary disposition in lieu of filing an answer, arguing that Bellefeuil was collaterally estopped from bringing the tort case because the underlying issue of "coaching" had been submitted to the arbitrator. The circuit court rejected this argument, finding that the issue of whether Wilson coached LBW "was not essential to the arbitrator's custody determination." Wilson then filed an answer and a counterclaim alleging defamation and invasion of privacy. The circuit court denied Bellefeuil's motion for summary disposition of the counterclaim.

When discovery closed Wilson sought summary disposition under MCR 2.116(C)(10), contending that Bellefeuil had not evidentially supported his claim that she coached LBW's false disclosure. Bellefeuil responded that abundant circumstantial evidence supported this allegation. The circuit court found that Bellefeuil's claims were purely speculative and dismissed them. Bellefeuil now appeals, and Wilson cross-appeals.

## II. SUMMARY DISPOSITION OF BELLEFEUIL'S CLAIM WAS IMPROPER

### A. UNDERLYING LEGAL PRINCIPLES

We consider the circuit court's summary disposition decision without deference to the trial court by familiarizing ourselves with the pleadings, admissions, affidavits, and other record documentary evidence in the light most favorable to the nonmoving party. *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). Viewing the evidence in the light most favorable to the nonmoving party means that a court may not make findings of fact or assess the credibility of witnesses. *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142-143; 753 NW2d 591 (2008). When

-8-

the record leaves open an issue on which reasonable minds could differ, a genuine issue of material fact exists, precluding summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "[S]ummary disposition is rarely appropriate in cases involving questions of credibility, intent, or state of mind." *In re Handelsman*, 266 Mich App 433, 438; 702 NW2d 641 (2005).

Viewing the evidence in the light most favorable to the nonmoving party encompasses a court's consideration of reasonable inferences drawn from both the direct and circumstantial evidence of record. Summary disposition is improper when a trier of fact could draw reasonable inferences supporting a claim from the evidentiary facts:

> It is a basic proposition of law that determination of disputed issues of fact is peculiarly the jury's province. Even where the evidentiary facts are undisputed, it is improper to decide the matter as one of law if a jury could draw conflicting inferences from the evidentiary facts and thereby reach differing conclusions as to ultimate facts. [*Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979) (citations omitted).]

Inferences of negligence, intent, or deliberate conduct may arise from circumstantial or direct evidence. Justice Thomas Cooley explained that in the negligence context, "positive proof" of negligence is not required where an "inference" of negligence is "irresistible." *Alpern v Churchill*, 53 Mich 607, 612-613; 19 NW 549 (1884). Because inferences suffice, direct evidence is not a prerequisite to proving any element of a civil or a criminal case.

> In fact it is an unusual case where none of the issues confronting the jury (including duty, breach, and causal connection) is established, at least in part, by a process of inference from relevant and established facts. To the degree that we employ such a process of inference we are using circumstantial evidence. We do it constantly. The law would be paralyzed without it. [*Indiana Lumbermens Mut Ins Co v Matthew Stores, Inc*, 349 Mich 441, 444; 84 NW2d 755 (1957) (SMITH, J., concurring.]

When is an inference reasonable, or strong enough to sustain a claim? The Supreme Court of the United States has observed that "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Tellabs, Inc v Makor Issues & Rights, Ltd*, 551 US 308, 323; 127 S Ct 2499; 168 L Ed 2d 179 (2007). *Tellabs* involved a federal securities fraud statute requiring that a plaintiff plead facts demonstrating a "*strong* inference" an intent to deceive. *Id.* at 314 (emphasis added). To satisfy even the "strong inference" standard, the Supreme Court wrote, "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Id.* at 324. Here, we apply a reasonable inference standard, which means we consider whether a conclusion logically and reasonably flows from the facts presented. To avoid summary disposition under MCR 2.116(C)(10) in a case utilizing inferences, a party need not produce direct evidence or even "positive proof"; it is enough to identify a body of circumstantial evidence and logical inferences flowing from it that reasonably supports a conclusion.

Wilson asserts, and the circuit court found, that the evidence supporting Bellefeuil's coaching claim was speculative and conjectural rather than reasonably inferable. Our Supreme Court has explained the difference between inference and conjecture as applied to causation as follows:

> As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence. [*Kaminski v Grand Trunk W R Co*, 347 Mich 417, 422; 79 NW2d 899 (1956) (quotation marks and citation omitted).]

The take-away from *Kaminski* is that a permissible inference is rooted in evidence, while a conjecture is more akin to a guess, or a theory for which there is no evidentiary support, either directly or circumstantially. As discussed below, Bellefeuil supported his claim with direct evidence, circumstantial evidence, and inferences logically flowing from both.

Bellefeuil alleges a claim on intentional infliction of emotional distress. A prima facie claim of IIED is established by evidence of "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Dalley v Dykema Gossett PLLC*, 287 Mich App 296, 321; 788 NW2d 679 (2010) (quotation marks and citation omitted). Wilson does not challenge that if proven, the alleged coaching satisfies the requirements of extreme and outrageous conduct and his severe emotional distress. Indeed, it cannot be disputed that "coaching a child to make a false allegation of sexual abuse against [a parent] is an intentional act to inflict emotional distress . . . that goes beyond all possible bounds of decency, and our civilized community must regard it as atrocious and utterly intolerable." *WTA v MY*, 58 So3d 612, 617 (La App, 2011).

## B. LEGAL PRINCIPLES, APPLIED

The issue presented is whether Bellefeuil sufficiently supported his IIED claim with evidence that Wilson intentionally coached their daughter to falsely claim that he had sexually abused her. What is "coaching"? Surprisingly, the caselaw supplies no solid or universal definition. Coaching has been described as suggesting facts to a witness, prompting a witness to make certain (usually false) factual claims, encouraging a witness to say something that is not true or which the witness does not really remember, or otherwise deliberately influencing a witness's testimony. Under any of these rubrics, direct evidence supports that Wilson coached LBW to say that Bellefeuil had engaged in sexually abusive activities, and circumstantial evidence supports a reasonable inference that Wilson deliberately and intentionally coached LBW to gain advantage in a custody battle.

We start with the videotaped bath-time discussion that gave rise to the allegations against Bellefeuil and was the primary "evidence" of his alleged acts. Bellefeuil testified that Wilson

rarely if ever bathed LBW, and the evidence reveals that when she elected to do so on July 24, 2017, she brought a cellphone with her into the bathroom.[3] The transcript of that conversation indicates that Wilson and LBW had an initial conversation about "what your daddy did up north"; after which Wilson activated her phone's video recorder and, by asking multiple leading questions, steered LBW's disclosures. For example, Wilson asked LBW "and then what did he do with his finger?" When LBW replied that Bellefeuil "then hit me right in the head" with it, Wilson followed by suggesting a better answer: "And then he put his finger in your – where did he put his finger?" As cued, LBW responded that Bellefeuil put it "over here and here where my poop comes out of." Wilson then made an obvious but unsuccessful effort to coach LBW into saying that Bellefeuil had ejaculated on her:

WILSON: When he was peeing on you, honey, was it white?

LBW: It was black.

WILSON: It was black.

LBW: Uh-huh.

WILSON: Well that doesn't make any sense. Honey, look at me. Are you telling the truth?

Wilson continued by asking LBW if "he put anything in your mouth?" When LBW responded that he had put "paper" in her mouth, Wilson again course-corrected LBW by inquiring: "What does he put in your mouth, baby doll?" This time, LBW responded that "[h]e put poop in my mouth." Not satisfied with this answer (for obvious reasons), Wilson persisted by asking, "Has be put his penis in your mouth?" The exchange that followed is further evidence of coaching, particularly given LBW's two denials that Bellefeuil had penetrated her mouth with his penis:

WILSON: Has he put his penis in your mouth?

LBW: Peanuts?

WILSON: Huh?

LBW: Peanuts?

WILSON: You know what he pees from?

LBW: No.

WILSON: You know what he pees from, what Daddy pees from?

---

[3] Regarding this fact the arbitrator commented: "Why would [LBW's] mother have a smart phone in her hand while bathing her child? The video shows no evidence of upset or anguish by [LBW] or her mother . . . ." The arbitrator further queried: "Why was [LBW] asked leading questions?"

LBW: No.

WILSON: Has he put that in your mouth or near your privates or anything like that?

LBW: He put it in my - - in my mouth.

WILSON: He did?

LBW: Uh-huh.

WILSON: When did he do that?

LBW: Like up north. Like - - (inaudible) - - that he did that.

WILSON: Up north?

LBW: Uh-huh.

WILSON: Okay. Just this time when you were up north?

LBW: A lot of times.

Thus, the audiotape provides *direct* evidence that Wilson prompted or encouraged LBW to make certain claims and deliberately influenced LBW's "memory" and statements. Wilson's leading questions and repeatedly suggested answers shaped the form and generated the content for LBW's false recital of Bellefeuil's multiple acts of sexual and physical abuse. The interrogation of LBW proceeded under an obvious and unmistakable assumption that Bellefeuil had done something inappropriate "up north," and that LBW would "disclose" the details. That LBW's descriptions of what supposedly happened expanded into the bizarre and impossible ("black pee") did not constrain the questioning.

We interpret the transcript in the same way as the arbitrator did: as consistent with, but not necessarily dispositive evidence of, intentional coaching:

At worst, the recorded conversations indicate that Ms. Wilson deliberately coached or suggested [LBW's] disclosure to her. At best, they indicate very questionable conduct by Ms. Wilson, who was in a very vulnerable position and who had an obvious and huge financial incentive to pursue this purported claim of sexual abuse against Mr. Bellefeuil.

Unlike the arbitrator, we have not watched the parties testify, nor have we reviewed the videotape.[4] Even without watching the video, a reasonable juror reading the transcript could conclude that Wilson coached LBW to describe multiple acts of physical and sexual abuse.

Circumstantial evidence buttresses that Wilson's questioning qualifies as coaching. Wilson had a motive to obtain sole custody of the children, which would entitle her to a large amount of child support. As the arbitrator put it: "She clearly had an incentive to manufacture the sexual assault allegations against Mr. Bellefeuil." Whether this motive led to coaching is a fact question that remains unanswered, but which a jury could answer in the affirmative. Wilson's highly suggestive questioning of LBW, coupled with her animosity toward Bellefeuil and her motive to obtain full custody of the children, supply evidence rather than conjecture that she deliberately used her daughter to falsely accuse Bellefeuil of child sexual abuse.

We highlight that at this stage of the proceedings, Bellefeuil was not obligated to come forward with a *preponderance* of evidence that Wilson had coached LBW. Rather, MCR 2.116(C)(10) requires that a nonmovant point to competent record evidence that gives rise to a question about which reasonable minds could reach different conclusions. Summary disposition is not an occasion to weigh evidence. Rather, the question to be answered is whether the nonmovant has supported his claim with evidence, circumstantial or direct, creating a material question of fact. And in this case Bellefeuil fulfilled that requirement.

### III. COLLATERAL ESTOPPEL DOES NOT BAR BELLEFEUIL'S CLAIM

On cross-appeal, Wilson argues that the trial court erred by denying her motion for summary disposition under MCR 2.116(C)(7) because Bellefeuil's IIED claim is barred by the doctrine of collateral estoppel. "Collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding." *Rental Props Owners Ass'n v Kent Co Treasurer*, 308 Mich App 498, 528; 866 NW2d 817 (2014). For collateral estoppel to apply, "(1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel." *William Beaumont Hosp v Wass*, 315 Mich App 392, 398; 889 NW2d 745 (2016) (quotation marks and citation omitted). Further, "[t]he issues must be identical, not merely similar, and the ultimate issues must have been both actually and necessarily litigated." *Eaton Co Bd of Rd Comm'rs v Schultz*, 205 Mich App 371, 376-377; 521 NW2d 847 (1994) (citations omitted).

Wilson focuses on the first two prongs of the collateral estoppel test. Regarding the first prong, she contends that because the child custody case and the IIED suit both concern whether she coached LBW to falsely accuse Bellefeuil of sexual abuse, he is now estopped from bringing his IIED claim. Although this issue of fact was raised in the custody case, the issue was not "essential" to the arbitrator's custody determination. The arbitrator never determined whether Wilson coached LBW, although finding a "distinct possibility" that she engaged in such behavior.

---

[4] The videotape was not included in the appellate record although it was apparently provided to the trial court.

We view this as a determination that the evidence submitted to the arbitrator supported a reasonable conclusion that Wilson might have coached LBW. The balance of the arbitrator's lengthy report describes his finding that it was not in the interests of the parties or the children to dwell on whether there was coaching; the issue he ultimately decided was whether the parties should have joint custody of the children.[5] Thus, the coaching issue was not essential to the judgment, and Wilson has failed to meet the first element of the collateral estoppel test.

The same is true as to whether Bellefeuil had a fair opportunity to litigate this issue in the custody case. Although the coaching issue was raised in the custody proceeding, the trial court did not make a conclusive ruling on the matter. Beyond that, the broader matter at issue here—whether Wilson can be found liable for IIED—was certainly not litigated in the custody case. Accordingly, the second prong of the collateral estoppel test is also unfulfilled.

Absent the resolution of an essential fact question in the earlier custody proceeding and without a full and fair opportunity to previously litigate this issue, Wilson was not entitled to summary disposition on collateral estoppel grounds.

## III. CONCLUSION

The trial court improperly summarily dismissed Bellefeuil's IIED suit where there remained triable questions of fact regarding Wilson's intent and purpose in questioning LBW about potential sexual abuse. These questions cannot be resolved without finding facts and assessing the credibility of the witnesses, actions that cannot happen at the summary disposition phase.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado

---

[5] The arbitrator determined that the children's best interests would be served by joint custody despite the parties' differences and the challenges those differences might pose to joint custody.